Kenneth J. Yorgan,
Plaintiff-Respondent-Petitioner,

v.

Thomas W. Durkin, Defendant-Appellant.

Supreme Court

No. 2004AP1359. *Oral argument November 15, 2005.
—Decided June 2, 2006.*

2006 WI 60

(Also reported in 715 N.W.2d 160.)

For the plaintiff-respondent-petitioner there were briefs and oral argument by *Kenneth J. Yorgan,* Racine.

For the defendant-appellant there was a brief by *John A. Becker* and *Becker, French & DeMatthew,* Racine, and oral argument by *John A. Becker.*

An amicus curiae brief was filed by *Andrew W. Erlandson, Stephen P. Hurley,* and *Hurley, Burish & Milliken, S.C.,* Madison, on behalf of the Wisconsin Chiropractic Association, and there was oral argument by *Andrew W. Erlandson.*

¶ 1. ANN WALSH BRADLEY, J. Dr. Kenneth Yorgan seeks review of an unpublished court of appeals decision reversing a circuit court judgment that held Attorney Thomas Durkin liable for Yorgan's chiropractic fees, incurred by Sol Hernandez.[1] Hernandez, who was Attorney Durkin's client, signed an agreement with Dr. Yorgan directing her attorney to pay Yorgan and purporting to give a lien against any proceeds she might receive from her personal injury claim. Dr. Yorgan argues that he should be able to enforce the agreement against Attorney Durkin, who distributed the proceeds from Hernandez's claim without paying Yorgan.[2]

¶ 2. We determine that Dr. Yorgan may not hold Attorney Durkin liable for payment because Durkin did not sign the agreement or otherwise agree to be liable.

---

[1] *See Yorgan v. Durkin,* No. 2004AP1359, unpublished slip op. (Wis. Ct. App. Nov. 17, 2004) (reversing the judgment of the circuit court for Racine County, Charles H. Constantine, Judge).

[2] Yorgan is proceeding pro se in this case, but the Wisconsin Chiropractic Association has submitted an amicus brief. Unless otherwise indicated, we simply refer to Yorgan when discussing the arguments made by either him or the Association.

674

Additionally, we determine that imposing liability on Durkin is not dictated by public policy. Finally, we determine that Yorgan is not entitled to an equitable lien enforceable against Attorney Durkin. Accordingly, we affirm the court of appeals.

## I

¶ 3. Hernandez was involved in a car accident and received chiropractic treatment from Dr. Yorgan. At some point, Dr. Yorgan provided her with a form entitled "Authorization and Doctor's Lien" that consisted of the following terms:

> I do hereby authorize Doctor Kenneth Yorgan to furnish you, my attorney, a full report of the examination, diagnosis, treatment, prognosis etc., of myself, as well as any records or information he may have regarding injuries or health problems I may have arising from a personal injury accident occurring on or about: 8-6-99.[3]

> I hereby authorize and direct you, my attorney, to pay directly to Dr. Yorgan such sums as may be due and owing him for health services rendered to me by reason of this accident and to withhold such sums from any settlement, judgement or verdict as may be necessary to protect his interests. I further hereby give lien on my case to Dr. Yorgan against any and all proceeds of my settlement, judgement or verdict which may be paid to you, my attorney, or myself as a result of the injuries and health problems for which I have been treated or in connection thereto.

> I fully understand that I am directly and fully responsible to Dr. Yorgan for all fees submitted by him for services rendered to me and that this agreement is

---

[3] The accident date was hand-written on the form.

made solely for his additional protection and in consideration of his awaiting payment. I further understand that such payment is not contingent on any settlement, judgement or verdict by which I may eventually recover said fees.

Please acknowledge this letter by signing below and returning to Dr. Yorgan. Retain one copy for your records. *I have been advised that if my attorney does not wish to cooperate in protecting Dr. Yorgan's fees, he will not await payment and will require me to make payments on a current basis.*

(Emphasis added.)

¶ 4. At the bottom of the form, there was a signature line for Hernandez and a signature line for her attorney. Hernandez signed the form and subsequently retained Attorney Durkin to handle a personal injury claim relating to the car accident. During the course of Durkin's representation of Hernandez, Dr. Yorgan provided Durkin with 13 pages of medical records and included a copy of the form. Durkin, however, never signed it.

¶ 5. Attorney Durkin settled Hernandez's claim and, at some point, had a telephone conversation with Dr. Yorgan in which he asked Yorgan to reduce his bill. Ultimately, Durkin distributed the settlement proceeds without paying Yorgan.

¶ 6. Dr. Yorgan apparently made at least some attempts to collect against Hernandez, but he was unsuccessful. Yorgan thus filed a small claims action against Attorney Durkin, seeking to hold Durkin liable for his failure to forward payment to Yorgan in satisfaction of Hernandez's outstanding account of $2,104.40. Durkin moved for summary judgment, asserting that he did not have actual notice of the form

and that Hernandez was an indispensable party as the person responsible for the outstanding balance.

¶ 7. The circuit court ruled in favor of Dr. Yorgan. It determined that Attorney Durkin had actual notice of the form agreement and was bound by its terms to pay Yorgan. The court also determined that Hernandez, whose whereabouts were unknown, was not an indispensable party. Accordingly, the court entered judgment against Durkin.

¶ 8. Attorney Durkin appealed, and the court of appeals reversed the circuit court. It concluded that Durkin was not obligated to honor the agreement between Dr. Yorgan and Hernandez because Durkin had not acknowledged or accepted it. Dr. Yorgan petitioned for review.

II

¶ 9. In this case, we must address whether Dr. Yorgan may hold Attorney Durkin liable based on the "Authorization and Doctor's Lien" agreement under either a contract or equitable lien cause of action. This requires us to examine and interpret a written instrument to determine its effect. Such an undertaking is a question of law subject to independent appellate review. *See Micro-Managers, Inc. v. Gregory,* 147 Wis. 2d 500, 507, 434 N.W.2d 97 (Ct. App. 1988). In addition, we must determine whether liability should otherwise be imposed on Attorney Durkin based on public policy considerations, also a question of law for this court's independent determination. *See Auric v. Continental Cas. Co.,* 111 Wis. 2d 507, 512, 331 N.W.2d 325 (1983).

¶ 10. We begin our analysis with *Riegleman v. Krieg,* 2004 WI App 85, 271 Wis. 2d 798, 679 N.W.2d 857, a case in which the court of appeals examined the effect of a similar instrument under circumstances involving an attorney, a chiropractor, and the proceeds from their client/patient's personal injury claim. *Riegleman,* 271 Wis. 2d 798, ¶¶ 1–3, 25. There, however, the attorney had signed the instrument. *Id.,* ¶ 2.

¶ 11. The court in *Riegleman* addressed whether, under those circumstances, the instrument constituted a contract that made the client/patient and his attorney jointly and severally liable. *Id.,* ¶¶ 25, 27. It determined that the instrument was an unambiguous contract creating an assignment enforceable under contract law. *Id.,* ¶ 36. It concluded that the attorney and the patient/client were jointly and severally liable for the chiropractor's fees. *Id.,* ¶ 38.

¶ 12. In *Riegleman,* the court of appeals did not address the general assignability of a tort claim or its anticipated proceeds. We observe that the assignment of claims or rights arising under a contract has traditionally been distinguished from the assignment of claims or rights arising from a tort. *See* 9 *Corbin on Contracts,* §§ 856–57 (Interim ed. 2002); *see also* Restatement (2d) Contracts § 316 (1981). As a general rule, the latter are not as easily assignable as the former. 9 *Corbin on Contracts,* § 857, at 364; *see also* R. D. Hursh, *Assignability of Claim for Personal Injury or Death,* 40 A.L.R.2d 500, § 2 (1955).

¶ 13. The parties have not briefed the issue of the assignability of a claim or right arising from a tort.

Neither the court of appeals nor the circuit court here saw fit to reach out and address the issue. Likewise, we refrain from reaching it. "We cannot serve as both advocate and judge." *State v. Pettit,* 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992). Rather, we will assume without deciding that the "Doctor's Lien and Authorization" is a valid assignment but conclude that Dr. Yorgan cannot enforce it against Attorney Durkin for the reasons that follow.[4]

---

[4] The proper procedure is to have an issue raised, briefed, and argued by the parties before deciding it. Nevertheless, the dissent reaches out and addresses this issue. The dissent decides the issue, comparing the case at bar to the case of *D'Angelo v. Cornell Paperboard Products Co.,* 19 Wis. 2d 390, 396–97, 120 N.W.2d 70 (1963). In *D'Angelo,* this court stated that personal injury claims are assignable, subject to public policy limitations. *Id.* at 396–97. *D'Angelo,* however, is an insurance subrogation case. It involved a claim between two insurance companies after one of them had settled with the plaintiff in exchange for an assignment of rights.

We have located only two cases that cite *D'Angelo* for the proposition that a personal injury claim may be assignable. Those cases are also insurance subrogation cases. *See American Ins. Co. v. City of Milwaukee,* 51 Wis. 2d 346, 353–54, 187 N.W.2d 142 (1971); *Associated Hosp. Serv., Inc. v. Milwaukee Auto. Mut. Ins. Co.,* 33 Wis. 2d 170, 173 n.3, 147 N.W.2d 225 (1967). The dissent is alone in asserting the relevancy of *D'Angelo* to the instant case. Neither the parties, the amicus, the circuit court, nor the court of appeals have found it relevant to the analysis.

The dissent apparently believes that Dr. Yorgan should be treated just like an insurance company that has a subrogation clause in its policy. The public policy implications of the dissent's willingness to do so are significant, as our discussion in ¶¶ 30–33 of this opinion suggests.

In addition, the ramifications of extending subrogation jurisprudence in such a fashion are unexplored. For example,

¶ 14. *Riegleman* does not answer the question before us because the court in *Riegleman* did not address the issue of whether an attorney may be liable even though the attorney has not signed or otherwise accepted the terms of an agreement like the one here. The court's holding depended on the fact that the attorney had signed and therefore accepted the terms of the agreement. *See Riegleman,* 271 Wis. 2d 798, ¶¶ 27, 35, 37.[5]

¶ 15. In our view, it is significant whether the attorney has signed the agreement or otherwise accepted its terms. Here, applying basic contract principles, we determine that Attorney Durkin was not a

_____

under the dissent's insurance-subrogation approach, must there be a hearing under *Rimes v. State Farm Mutual Automobile Insurance Co.,* 106 Wis. 2d 263, 316 N.W.2d 348 (1982), to determine whether Hernandez has been made whole before Dr. Yorgan can collect? Under the dissent's insurance-subrogation approach, would Dr. Yorgan have been a necessary party to Hernandez's personal injury action? *See* Wis. Stat. § 803.03(2) (2003–04). Unlike the dissent, we think that before this court confronts the issue of the assignability of a tort claim (or its anticipated proceeds) in such a novel manner, the issue should be presented in the case and tested by adversarial briefs of the parties.

[5] The *Riegleman* court relied, in part, on Wis. Stat. § 402.210(5), a statutory provision pertaining to assignments and found within Wisconsin's version of the Uniform Commercial Code in the chapter covering sales contracts. See *Riegleman v. Krieg,* 2004 WI App 85, ¶ 26, 271 Wis. 2d 798, 679 N.W.2d 857. We do not place reliance on § 402.210(5) because we question its applicability to the types of instruments at issue in *Riegleman* and the case at bar. *See* Wis. Stat. § 402.102 ("Unless the context otherwise requires, this chapter applies to transactions in goods . . . .").

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

party to the agreement and not bound by it. Dr. Yorgan had no reasonable expectation that Durkin would be bound by the agreement if he did not sign it. Likewise, Yorgan had no reasonable reliance interest in Durkin's acceptance or rejection of the agreement. This is plain from the terms of the agreement, which Dr. Yorgan, not Hernandez or Attorney Durkin, supplied.

¶ 16. Specifically, we look to the following terms of the agreement:

> I fully understand that I am directly and fully responsible to Dr. Yorgan for all fees submitted by him for services rendered to me and that this agreement is made solely for his additional protection and in consideration of his awaiting payment. . . .
>
> . . . *I have been advised that if my attorney does not wish to cooperate in protecting Dr. Yorgan's fees, he will not await payment and will require me to make payments on a current basis.*

(Emphasis added.)

¶ 17. These terms of the agreement condition Dr. Yorgan's offer to await payment on the attorney's signature. They also indicate that Dr. Yorgan could not have reasonably expected that Hernandez's attorney would be bound by the agreement without signing it. Similarly, they show that Dr. Yorgan did not reasonably rely on the agreement as to the attorney's responsibility for payment absent an attorney signature.

¶ 18. The plain language of the agreement contemplates that Hernandez's attorney might not sign it, and the agreement reserved to Dr. Yorgan the option of effectively canceling it in that event. By its terms, Dr. Yorgan was free to require Hernandez to remain current on her account unless her attorney signed it.

¶ 19. Dr. Yorgan apparently chose not to fully enforce the terms of the agreement against Hernandez. Rather, he permitted her to accumulate an outstanding balance of over $2,000 even though her attorney never signed the agreement.

¶ 20. We also determine that Attorney Durkin cannot be deemed to have otherwise accepted the terms of the agreement under the circumstances of this case. Although he received copies of Hernandez's medical records from Dr. Yorgan, they were not consideration or an independent benefit provided by Dr. Yorgan to Durkin. Attorney Durkin received the records on Hernandez's behalf in the course of his representation of Hernandez. Durkin's receipt of the records cannot constitute his acceptance of the terms of the agreement or otherwise give rise to a contractual obligation running from him to Yorgan.[6]

¶ 21. In some circumstances, an attorney may agree to be contractually bound by proffering a "letter of protection." Such letters are "a common practice by which lawyers representing personal injury plaintiffs ensure clients will receive necessary medical treatment, even if unable to pay until the case is concluded."

---

[6] We have no reason to think that the records Dr. Yorgan provided to Attorney Durkin were anything other than copies of Hernandez's pre-existing health care records, generated in the normal course of her treatment. In other words, it is not the situation here that Dr. Yorgan went uncompensated for creating an expert report or similar document at Attorney Durkin's request.

In addition, we note that we need not reach the issue of whether a health care provider's agreement to provide health care records to a patient or her representative can, by itself, constitute consideration for a contract between a health care provider and a patient or the patient's representative. *See* Wis. Stat. §§ 146.83 and 146.81(1)(b), (3), and (4).

*Riegleman,* 271 Wis. 2d 798, ¶ 30 n.5 (citing *In re Moore,* 4 P.3d 664, 665 n.1 (N.M. 2000)). Use of the letter has been explained as "a document by which a lawyer notifies a medical vendor that payment will be made when the case is settled or judgment is obtained." *Id.* Here, Attorney Durkin was not bound either as a party to the agreement or by any other instrument such as a letter of protection.

¶ 22. In *Riegleman,* the court relied on four cases from two other jurisdictions. In all but one of the cases, *Berkowitz v. Haigood,* 606 A.2d 1157, 1158–59 (N.J. Super. Ct. Law Div. 1992), it was clear that the attorney had either signed an agreement or sent a letter of protection. *See Moore,* 4 P.3d at 665; *Matter of Rawson,* 833 P.2d 235, 238 (N.M. 1992); *Romero v. Earl,* 810 P.2d 808, 808–09 (N.M. 1991). There are other cases along similar lines. *See Santiago v. Klosik,* 404 S.E.2d 605, 606 (Ga. Ct. App. 1991); *In the Matter of Allen,* 802 N.E.2d 922, 924 (Ind. 2004). Our conclusion that Attorney Durkin was not bound either as a party to the agreement or by any other instrument is supported by the great weight of these authorities.[7]

¶ 23. Dr. Yorgan nonetheless argues that Attorney Durkin's duty was to follow his client's directions, which Yorgan asserts were clear under the agreement. Therefore, Yorgan asserts, Durkin is liable to him because he failed to pay Hernandez's outstanding balance according to her directions. We do not agree with Yorgan's analysis of Attorney Durkin's liability.

¶ 24. Initially we observe that it is not accurate to say that agreements such as the one here necessarily and unequivocally dictate the scope of an attorney's duty to his or her client. What the attorney's duty to the

---

[7] Some of these cases are attorney discipline cases and therefore do not address attorney liability in a civil suit.

client requires in the face of such an agreement will depend on the facts of the case, including whether the attorney signed the agreement.

¶ 25. For example, if the attorney has not signed the agreement and knows that the client disputes the reasonableness of fees charged by a health care provider, the attorney may actually breach his or her duty to the client by paying the provider. However, if the attorney has signed the agreement and knows of such a dispute, the attorney may be obligated to withhold the amount of disputed funds from the client; if the attorney does not want to hold funds indefinitely, then the attorney has the option of bringing an action for declaratory judgment to seek guidance from the court. *Riegleman,* 271 Wis. 2d 798, ¶ 36.[8]

¶ 26. Having made that initial observation, we will assume that Dr. Yorgan is correct that Attorney Durkin's duty to Hernandez was to pay Yorgan. Even

---

[8] *See also* SCR 20:1.15(d) (2006). We note that the Rules of Professional Conduct for Attorneys are not determinative of an attorney's civil liability:

> Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. . . .

SCR 20, Preamble; *see also Williams v. Rexworks, Inc.* 2004 WI App 228, ¶ 20, 277 Wis. 2d 495, 691 N.W.2d 897 ("[I]t is clear from the preamble, and from the lack of any authority to the contrary, that the [Rules of Professional Conduct for Attorneys] do not provide an independent basis for civil liability, and do not create any presumption that a legal duty has been breached."); *Nauga, Inc. v. Westel Milwaukee Co.,* 216 Wis. 2d 306, 318 n.5, 576 N.W.2d 573 (Ct. App. 1998). Thus, we need not and do not address the applicability of the Rules to the circumstances here.

so, this does not necessarily mean that Yorgan may hold Durkin liable for breaching that duty.

■

¶ 27. "[T]he well established rule of law in Wisconsin is that absent fraud or certain public policy considerations, an attorney is not liable to third parties for acts committed in the exercise of his duties as an attorney." *Newhouse v. Citizens Sec. Mut. Ins. Co.*, 176 Wis. 2d 824, 841, 501 N.W.2d 1 (1993); *accord Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 321, 401 N.W.2d 816 (1987); *Auric*, 111 Wis. 2d at 512; *Beauchamp v. Kemmeter*, 2001 WI App 5, ¶ 7, 240 Wis. 2d 733, 738, 625 N.W.2d 297 (Ct. App. 2000).[9]

¶ 28. Here, Yorgan is not alleging or asserting fraud or collusion. Thus, we are faced with the question of whether to recognize a new type of exception to the general rule of attorney non-liability to third parties. This requires that we consider the public policy implications of such an exception. *Newhouse*, 176 Wis. 2d at 841; *see also Auric*, 111 Wis. 2d at 512.

---

[9] Absent fraud, it appears that the only well-established exception to the general rule of attorney non-liability to third parties arises in the estate planning context. *Auric v. Continental Cas. Co.*, 111 Wis. 2d 507, 512, 331 N.W.2d 325 (1983) (holding that the beneficiary of a will may maintain an action against an attorney who negligently drafted or supervised the execution of the will); *Wisconsin Acad. of Sciences, Arts & Letters v. First Wisconsin Nat'l Bank*, 142 Wis. 2d 750, 758, 419 N.W.2d 301 (Ct. App. 1987) (applying the holding in *Auric* to a trust); *cf. Beauchamp v. Kemmeter*, 2001 WI App 5, ¶ 9, 240 Wis. 2d 733, 738, 625 N.W.2d 297 (Ct. App. 2000) (holding that a third party's cause of action under *Auric* is limited to situations in which the third party is named in an executed or unexecuted will or similar estate planning document).

¶ 29. There is no set list of public policy factors to consider.[10] Our review of the relevant case law leads to the conclusion that we must consider the particular public policies implicated by the nature of the situation at hand. In addition, the cases suggest that the factors to consider may include (1) whether imposing liability in favor of a third party may compromise the attorney's duties to his or her client, *see Green Spring Farms,* 136 Wis. 2d at 329, and (2) whether the third party is aware of the potential for harm and has the obligation or ability to undertake his or her own investigation of the matter to protect himself or herself, *see id.* at 324; *Goerke v. Vojvodich,* 67 Wis. 2d 102, 107, 226 N.W.2d 211 (1975).

¶ 30. Turning to the public policies that this case implicates, we determine that, on balance, they do not dictate in favor of liability. We are mindful that agreements such as the one between Dr. Yorgan and Hernandez arguably may help to facilitate access to health care for some patients. However, we are also mindful that these same patients may need access to attorneys and courts in order to receive compensation for their injuries and otherwise vindicate their rights.

---

[10] The court in *Auric,* in addressing liability in will beneficiary suits against attorneys, adopted a five-factor test used in other jurisdictions. The factors are "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm." *Auric,* 111 Wis. 2d at 514 (quoting *Lucas v. Hamm,* 364 P.2d 685, 687 (Cal. 1961)). The court subsequently explained in *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 326–27, 401 N.W.2d 816 (1987), that the application of this test is restricted to the estate planning context.

¶ 31. Allowing third-party creditors such as Dr. Yorgan to hold liable an attorney with notice of client debt, absent more, may deter attorneys from accepting personal injury cases and negatively impact injured parties' access to courts. This would be particularly true, as here, when it appears that a claim is relatively small and that the claimant's financial resources are limited. Taking a broader view than Dr. Yorgan does, we must bear in mind that it is the willingness of attorneys to take these types of cases that helps ensure compensation not only for patients who are tort victims but also for health care providers who are their creditors.

¶ 32. We see no readily discernable stopping point on attorney liability if liability is imposed for the reasons Yorgan advances. A variety of client creditors would need only send the client's attorney a copy of their agreements with the client in order to enlist the attorney as a de facto collection agent who would be required to correctly prioritize and pay client debts or risk liability. Putting attorneys in this position may compromise their duties to their clients.

¶ 33. It is not difficult to imagine a proliferation of agreements like those here, in which clients seek to give an interest in personal injury claim proceeds as security to creditors in addition to health care providers. For example, Durkin's attorney relates an instance in which a client had assigned a portion of anticipated proceeds from a personal injury claim to the client's landlord in order to avoid eviction.

¶ 34. In addition, for reasons we have already discussed, Dr. Yorgan should have known based on the plain language of the agreement that he might not be protected unless Attorney Durkin signed the agreement or took some other affirmative action. Dr. Yorgan was, or should have been, aware of the potential for harm

687

that an unsigned agreement could create. At the same time, he had at least some ability to seek to ensure his protection by insisting on an attorney's signature on the agreement or a letter of protection.

¶ 35. We are sympathetic to Dr. Yorgan and commend him for his efforts, as described at oral argument, to serve patients who would ordinarily have difficulty affording or otherwise accessing chiropractic services. However, we must look beyond this case to the consequences that are likely to follow from the type of new exception to the general rule of attorney non-liability to third parties he asks us to impose. On balance, we think that public policy considerations weigh in favor of declining to adopt a new exception.

¶ 36. Finally, we turn to an argument made by the Wisconsin Chiropractic Association that Dr. Yorgan should be deemed to have a lien that is personally enforceable against Attorney Durkin. Specifically, the Association is arguing that Yorgan should have an equitable lien against Hernandez's settlement proceeds and enforceable against Durkin.

¶ 37. In addressing this argument, we begin by observing that the legislature has enacted very few statutory lien provisions. More specifically, and as relevant here, the statutory lien provisions for a health care provider that the legislature has enacted are limited to entities operating as a charitable institution and maintaining a hospital in this state. Wis. Stat. § 779.80.[11] In order for such a lien to attach to a personal injury claim or the proceeds resulting from it, the hospital must comply with detailed notice require-

---

[11] Among the few statutory lien provisions enacted by the legislature are those for attorney's fees. *See* Wis. Stat. §§ 757.36, 757.37, and 757.38; *see also Stasey v. Stasey,* 168 Wis. 2d 37, 53, 483 N.W.2d 221 (1992).

ments. *See* § 779.80(2) and (3). Some states, unlike Wisconsin, have statutory lien provisions that cover a relatively broad class of health care providers in relation to services provided for personal injury claimants. *See, e.g.,* Neb. Rev. Stat. § 52–401 (2005); Okla. Stat. tit. 42, § 46 (2005).

¶ 38. An equitable lien, in contrast, is a more general creature of the law. "The essential elements of equitable liens include (1) a debt, duty or obligation owing by one person to another[,] and (2) a res to which that obligation fastens, which can be identified or described with reasonable certainty." *McIntyre v. Cox,* 68 Wis. 2d 597, 602, 229 N.W.2d 613 (1975) (citations omitted).[12] In Wisconsin, the equitable lien doctrine is based on the Restatement (2d) of Restitution. *See id.* at 601. The Restatement provides that "[w]here property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises." Restatement (2d) of Restitution § 161 (1937); *see also McIntyre,* 68 Wis. 2d at 601.

¶ 39. We determine that Dr. Yorgan is not entitled to an equitable lien enforceable against Attorney Dur-

---

[12] The Association states that there are three elements for an equitable lien as follows: "The necessary elements of an equitable lien are [1] 'a debt, duty or obligation owing by one person to another' and [2] a 'res to which that obligation fastens'; [3] they arise 'from written contracts showing an intention to charge some particular property with the payment of a debt.' " *O'Connell v. O'Connell,* 2005 WI App 51, ¶ 13, 279 Wis. 2d 406, 694 N.W.2d 429 (quoting *McIntyre v. Cox,* 68 Wis. 2d 597, 602, 229 N.W.2d 613 (1975)). The formulation of the elements is not important for purposes of this case.

kin for at least three reasons. First, it is Hernandez, not Attorney Durkin, who has been unjustly enriched at Dr. Yorgan's expense. Second, allowing for an equitable lien in this manner would seem to circumvent the general rule against attorney non-liability to third parties, undermining the public policy analysis that we must undertake before adopting a new exception to that rule.

¶ 40. Third, the imposition of an equitable lien in favor of Dr. Yorgan and against Attorney Durkin would be inconsistent with the legislature's policy choice, as reflected in the hospital lien statute: to limit lien rights to a narrow class of health care providers and to qualify those rights with detailed notice requirements. If there is to be a change in the law that has the effect of altering the scheme of health care provider liens in the personal injury context, the legislature is in the better position to make that change.

¶ 41. In addition, the parties have not fully briefed the issue of whether the future proceeds of a tort claim may constitute a res to which an equitable lien may fasten. A res to which an obligation fastens is a necessary element of an equitable lien claim. The principal case cited by the Association on this issue, however, appears to stand for the proposition that an equitable lien generally does not arise from a promise to pay an obligation from insurance proceeds that are expected to be received in the future. *See Bartholomew v. Thieding,* 225 Wis. 135, 138–39, 273 N.W. 468 (1937).[13]

---

[13] Our research into Wisconsin law leaves unclear whether the anticipated proceeds of a tort claim may constitute a res to which an equitable lien may fasten. *See O'Connell,* 279 Wis. 2d 406, ¶ 16 n.10 (explaining that no equitable lien was created in the case of *McIntyre* because the claimant had an interest in proceeds, not land, and because no debt existed until the

## IV

¶ 42. In sum, we determine that Dr. Yorgan may not hold Attorney Durkin liable for payment because Durkin did not sign the agreement or otherwise agree to be liable. Additionally, we determine that imposing liability on Durkin is not dictated by public policy. Finally, we determine that Yorgan is not entitled to an equitable lien enforceable against Durkin.[14] Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 43. JON P. WILCOX, J. (*concurring*). I ultimately join the majority opinion. The law in Wisconsin on this particular issue is meager at best, but it does suggest that an attorney cannot be held liable to a third-party creditor for a failure to ensure payment when the attorney does not agree to a purported assignment of settlement proceeds. Notwithstanding this holding, I write separately to express my view that in cases such as this, an exception should be made when

property was sold). Yet, the existence of such a res is a necessary ingredient to the dissent. We note that essentially all of the Wisconsin cases cited by the dissent in support of its equitable lien analysis involve real estate. *See generally In re Stoffregen,* 206 B.R. 939 (Bankr. E.D. Wis. 1997); *Rock River Lumber Corp. v. Universal Mortgage Corp.,* 82 Wis. 2d 235, 262 N.W.2d 114 (1978); *Carefree Homes, Inc. v. Production Credit Ass'n,* 81 Wis. 2d 541, 260 N.W.2d 759 (1978); *McIntyre,* 68 Wis. 2d 597; *Citizens Loan & Trust Co. v. Witte,* 110 Wis. 545, 86 N.W. 173 (1901); *O'Connell,* 279 Wis. 2d 406.

[14] Having made these determinations, we need not reach Attorney Durkin's argument that the circuit court should have dismissed the case because Hernandez was an indispensable party.

the attorney has actual notice of a professed assignment of settlement funds between a client and a health care provider. As such, I respectfully concur.

¶ 44. After injuring herself in a motor vehicle accident, Sol Hernandez sought chiropractic treatment from Dr. Yorgan. Hernandez was unable to pay for the treatment she received from Dr. Yorgan, so she executed a form entitled "Authorization and Doctor's Lien" (Agreement) provided by Dr. Yorgan. *See* majority op., ¶ 3.

¶ 45. Hernandez subsequently sought an attorney to handle her personal injury claim, and she eventually retained Attorney Durkin. After Hernandez completed treatment with Dr. Yorgan, Attorney Durkin requested Hernandez's medical records from Dr. Yorgan's office. Dr. Yorgan sent the records and included the Agreement. Attorney Durkin never signed it, but there is no dispute that he had actual notice about the Agreement. Further, Attorney Durkin did not send a letter or other acknowledgment accepting or declining the purported assignment contained in the Agreement.

¶ 46. Prior to Hernandez's settlement, Attorney Durkin contacted Dr. Yorgan to ask if he would reduce his fee; Dr. Yorgan refused. Subsequent to this conversation and with the knowledge that Dr. Yorgan was expecting payment from the proceeds, Attorney Durkin disbursed the funds, less attorney's fees, to Hernandez. Dr. Yorgan never received any payment.

¶ 47. In my view, a better rule would be that in cases such as this, when an attorney has actual notice of a purported assignment between a client and a medical provider, yet still chooses to release the assigned settlement funds without notifying the health care provider, the attorney may be held liable. Other jurisdictions have reached a similar conclusion. *See, e.g., Kaiser*

*Found. Health Plan, Inc. v. Aguiluz,* 54 Cal. Rptr. 2d 665 (Cal. Ct. App. 1996) overruled on other grounds by *Snukal v. Flightways Mfg., Inc.,* 3 P.3d 286 (Cal. 2000); *Berkowitz v. Haigood,* 606 A.2d 1157 (N.J. Super. Ct. Law Div. 1992) (attorney has the obligation to honor an assignment if properly notified).

¶ 48. Although I recognize that the Rules of Professional Conduct for Attorneys do not provide the basis for civil liability, *see* SCR 20, Preamble, I call attention to them because they provide certain ethical guidelines for how an attorney should approach a situation such as this when a preexisting agreement purporting to assign settlement proceeds is discovered by the attorney.[1]

> (1) *Notice and disbursement.* Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.
>
> . . . .
>
> (3) *Disputes regarding trust property.* When the lawyer and another person or the client and another person claim ownership interest in trust property identified by a lien, court order, judgment, or contract, the lawyer shall hold that property in trust until there is an accounting and severance of the interests. *If a dispute*

---

[1] I cite to the 2006 version of Supreme Court Rule 20:1.15, which has been modified since the underlying transaction in this case. Attorney Durkin cannot be held to the higher ethical standards of these modified rules and did not violate the ethical rules in force at the time of the transaction.

*arises regarding the division of the property, the lawyer shall hold the disputed portion in trust until the dispute is resolved. . . .*

SCR 20:1.15(d)(1), (3) (2006) (third emphasis added).

¶ 49. The Comment to this Rule further explains the following:

*Third parties, such as a client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law, including SCR 20:1.15(d), to protect such 3rd-party claims against wrongful interference by the client, and accordingly, may refuse to surrender the property to the client.* However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the 3rd party.

If a lawyer holds property belonging to one person and a second person has a contractual or similar claim against that person but does not claim to own the property or have a security interest in it, the lawyer is free to deliver the property to the person to whom it belongs.

Comment, SCR 20:1.15(d) (2006) (emphasis added).

¶ 50. The Rules suggest that when an attorney knows a third party claims an interest in future settlement proceeds which the client has agreed to, the best course of action is to hold the money in trust until the matter can be resolved through a proper procedure.

¶ 51. In order to avoid situations such as the one Attorney Durkin found himself in this case, it seems appropriate that attorneys should not remain silent in the face of a written demand for the assurances of payment. The attorney should unambiguously notify the health care provider whether he or she intends to be bound to the agreement.

694

¶ 52. I am not suggesting that attorneys have a duty to investigate the financial affairs of their clients prior to releasing settlement funds. I am merely suggesting that when an attorney has actual notice of a purported assignment of settlement proceeds, as in this case, he or she should take the proper precautionary steps suggested by the ethics rules before releasing the funds. Such a rule would help prevent the unjust result of this case.

¶ 53. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). Because the need for medical care arose out of the same accident as did the settlement proceeds and there is no evidence in the record that Sol Hernandez (Hernandez) provided Attorney Durkin (Durkin) any instructions about the disbursement of the settlement proceeds to Doctor Yorgan (Yorgan) that were contrary to the assignment she executed in favor of Yorgan, I conclude that Hernandez validly assigned to Yorgan settlement proceeds from her personal injury claim, up to the amount of the charges for the chiropractic treatments Yorgan provided to Hernandez. I also conclude that Hernandez granted Yorgan a lien to secure payment of the debt for which the assignment was made, and that the lien can be enforced against the settlement proceeds because Yorgan's lien existed before Durkin had any right to retain a portion of the proceeds and Durkin had knowledge of both the assignment and Yorgan's lien. Accordingly, I would permit Yorgan to recover from Durkin to the extent of the settlement proceeds Durkin received or the amount due to Yorgan for the chiropractic care he provided to Hernandez, whichever is smaller.

¶ 54. I also conclude that the analysis of the majority opinion, which focuses on whether Durkin

entered into a contract to pay Yorgan,[1] misperceives the issue that is dispositive of this case. The analysis chosen by the majority opinion causes it to ignore the validity of Hernandez's assignment to Yorgan and the effect of the lien Hernandez gave on the settlement proceeds Durkin received. Therefore, I respectfully dissent.

## I. DISCUSSION

### A. Standard of Review

¶ 55. Whether one has validly assigned an interest in property is a question of contract interpretation subject to our independent review. *Edwards v. Petrone,* 160 Wis. 2d 255, 258, 465 N.W.2d 847 (Ct. App. 1990). Whether a lien has attached to property is also reviewed independently. *See McIntyre v. Cox,* 68 Wis. 2d 597, 602, 229 N.W.2d 613 (1975).

### B. Assignments

¶ 56. On December 15, 1999, Hernandez made a plain and unambiguous written assignment[2] to Yorgan of proceeds that may be received from her personal injury claim:

> I hereby authorize and direct you, my attorney, to pay directly to Dr. Yorgan such sums as may be due and owing him for health services rendered to me by reason of this accident and to withhold such sums from any settlement, judgement or verdict as may be necessary to protect his interests.

¶ 57. Moreover, the circuit court found that this document was sent to Durkin about November 1, 2000,

---

[1] *See* majority op., ¶ 2.

[2] Durkin does not contend that the assignment is ambiguous.

when Yorgan's office transmitted Hernandez's treatment records that Durkin had requested. The circuit court also found that Durkin settled Hernandez's personal injury claim about June, 2003 and that prior to reaching a settlement, Durkin contacted Yorgan to see if he would reduce the amount then due for chiropractic services. When Yorgan refused to do so, Durkin paid himself from the settlement proceeds and sent the rest of it to Hernandez, who is now nowhere to be found. There is no evidence in the record that Hernandez provided Durkin any instructions about the disbursement of the settlement proceeds to Yorgan that were contrary to the assignment she executed in favor of Yorgan. Accordingly, Durkin had notice of this assignment, expressly created by his client.

¶ 58. An assignment of an interest in the settlement proceeds from a personal injury claim may be made by a written contract. *Riegleman v. Krieg*, 2004 WI App 85, ¶ 25, 271 Wis. 2d 798, 679 N.W.2d 857. Unless there is some statutory or common law prohibition, the terms of the assignment control its effect. *See id.* When the terms are plain and unambiguous, we construe an assignment according to its plain meaning. *See Waukesha Concrete Prods. Co. v. Capitol Indem. Corp.*, 127 Wis. 2d 332, 339, 379 N.W.2d 333 (Ct. App. 1985).

¶ 59. I have located no statutory prohibition against assigning an interest in the settlement proceeds from a personal injury claim, and Durkin does not claim such a prohibition exists. In regard to whether there is a common law prohibition against such assignments, while *Riegleman* held that such an assignment was created, it did not directly address whether the common law affected its decision. The majority opinion ducks the issue by claiming that the dissent improperly con-

siders the validity of Hernandez's assignment in favor of Yorgan. Majority op., ¶ 13. It asserts that the circuit court did not address an assignment to Yorgan. *Id.* While the circuit court did not overtly analyze the elements of an assignment, it concluded that Hernandez did assign settlement proceeds to Yorgan when it said:

> The Court also holds that Mr. Durkin was bound by the terms of the direction given to him by Mr. [sic] Hernandez; that is, to pay Dr. Yorgan's bill. . . . [T]his Court is satisfied that Dr. Yorgan and Mr. [sic] Hernandez gave actual notice to Mr. Durkin of Dr. Yorgan's interest in the settlement of the proceeds.

Racine County Circuit Court Decision, Case No. 2003SC5353, p. 3.

¶ 60. The majority opinion also takes the dissent to task for analyzing whether Hernandez made an assignment to Yorgan because Yorgan, who appeared pro se, did not brief the issue. The majority opinion asserts:

> The proper procedure is to have an issue raised, briefed, and argued by the parties before deciding it. Nevertheless, the dissent reaches out and addresses this issue. . . . Unlike the dissent, we think that before this court confronts the issue of the assignability of a tort claim (or its anticipated proceeds) in such a novel manner, the issue should be presented in the case and tested by adversarial briefs of the parties.

Majority op., ¶ 13 n.4. However, the majority opinion overlooks Yorgan's brief. Yorgan contends that Hernandez assigned him sufficient proceeds from the future settlement of her personal injury claim to cover the cost of the medical care Yorgan provided as a result of the personal injuries Hernandez sustained. *See* Yorgan's

brief in chief, pp. 8–13; 17–19. In addition, the amicus addressed Hernandez's assignment of the settlement proceeds sufficient to pay Yorgan for the chiropractic services he rendered as a result of the accident:

> Once Ms. Hernandez assigned a portion of her settlement proceeds to Dr. Yorgan, Ms. Hernandez had no further interest in that portion of the settlement. Thus, Attorney Durkin, who received notice of the assignment and had no reasonable basis to doubt its validity, was obliged to pay to Dr. Yorgan that portion of the settlement proceeds that were the subject of Ms. Hernandez's assignment.

Brief of Amicus Curiae Wisconsin Chiropractic Association, p. 17. Therefore, the issue of Hernandez's assignment was presented to this court in the course of our review.

¶ 61. Although my research has located no Wisconsin appellate case that directly addressed the issue of whether one who has a claim for personal injuries can assign proceeds from that claim under the common law of Wisconsin, courts from other jurisdictions that have examined this issue have recognized the assignability of litigation proceeds under an appropriate agreement. They have distinguished between an older prohibition against assigning a claim for personal injury from the modern policy of permitting the assignment of *proceeds* from such causes of action. *See, e.g., In re Mucelli,* 21 B.R. 601, 603–04 (Bankr. S.D.N.Y. 1982) (holding that while a personal injury claim was not assignable and therefore was exempt property, the proceeds of that claim could be assigned and as such were not exempt); *In re Musser,* 24 B.R. 913, 919 (Bankr. W.D. Va. 1982) (holding that patients' assignments to medical providers of settlement or insurance payments to be received in the future were equitable

assignments); *Ala. Farm Bureau Mut. Cas. Ins. Co. v. Anderson,* 263 So.2d 149, 154 (Ala. Civ. App. 1972) (concluding that a subrogation clause requiring reimbursement from the proceeds of a personal injury claim to the insurer for health care payments it made was not a prohibited assignment).

¶ 62. In Wisconsin, contrary to the majority rule among our sister states, one may be able to assign an entire personal injury claim, which includes the proceeds received from the claim.[3] *D'Angelo v. Cornell Paperboard Prods. Co.,* 19 Wis. 2d 390, 398, 120 N.W.2d

[3] The majority opinion implies that by relying on the reasoning of *D'Angelo v. Cornell Paperboard Prods. Co.,* 19 Wis. 2d 390, 120 N.W.2d 70 (1963), the dissent is contending that Yorgan should be treated as an insurance company that has a contractually based subrogation right. Majority op., ¶ 13 n.4. The majority contends that if that is the case, a hearing under *Rimes v. State Farm Mutual Automobile Insurance Co.,* 106 Wis. 2d 263, 316 N.W.2d 348 (1982) may be necessary to determine whether Hernandez has been made whole, before Yorgan can be paid. Majority op., ¶ 13 n.4.

This contention is without legal foundation because the underlying principle of Wisconsin's made whole doctrine is that insurance companies are paid to take a risk of going unpaid. Therefore, when there is a dispute between an injured party who is not fully compensated and an insurance company that is not fully compensated, the burden of nonpayment must fall on the insurance company that was paid to take that risk. *Rimes,* 106 Wis. 2d at 276 (citing *Garrity v. Rural Mut. Ins. Co.,* 77 Wis. 2d 537, 542, 253 N.W.2d 512 (1977)). Yorgan was not paid to take the risk of nonpayment. Furthermore, as I explain below, I conclude that Hernandez assigned the proceeds of the settlement only to the extent necessary to pay Yorgan for the care he provided as a result of the accident that caused the need for that same medical care. To assign proceeds in excess of that amount would be contrary to public policy, as explained in *D'Angelo,* 19 Wis. 2d at 397–99.

70 (1963). *D'Angelo* involved the assignment of a personal injury claim for the payment of $120,000 to an injured worker. *Id.* at 396–97. When the assignee sued to enforce the assigned personal injury claim, it prayed for $300,000 in damages. *Id.* at 395. The defendant asserted the assignment was invalid because it was champertous and contrary to public policy. *Id.* We disagreed and upheld the assignment of the claim, but only to the extent of the payment that had been made to obtain the assignment. *Id.* at 397. In holding the assignment valid to up to $120,000, we relied in part on the statutory abrogation of the defense of champerty, then found in Wis. Stat. § 331.375 (2003–04),[4] now Wis. Stat. § 895.375, *id.*, and on the interest that the assignee had in the personal injury lawsuit because of the $120,000 payment it made to compensate for the injuries the assignor sustained. *Id.* at 398. In so limiting the assignment, we tied its validity to its connection with the personal injuries that formed the basis for the lawsuit that the assignee commenced to realize on the assignment. By limiting the assignment in that manner, we concluded that it did not violate public policy. *Id.* at 398–99.

¶ 63. The reasoning of *D'Angelo* applies with equal force to the assignment of proceeds that Hernandez executed in favor of Yorgan. Hernandez was injured in an accident, but payment from those responsible for her injuries was not available immediately following the accident, just as was the case in *D'Angelo*. Hernandez needed a way in which to pay for the medical treatment she required because of the automobile accident, just as the assignor in *D'Angelo* needed money

[4] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

after his injury. Yorgan was willing to provide immediate treatment, but to forgo immediate payment in exchange for an assignment of proceeds from the settlement of Hernandez's claim, just as the assignee was in *D'Angelo*. Furthermore, Yorgan is not requesting more than the dollar amount of his connection to the accident that formed the basis of Hernandez's personal injury claim because the assignment is capped by the charges for the medical care she required as a result of the accident. In *D'Angelo*, we confirmed the validity of an assignment made for a similar purpose, up to the amount of the assignee's connection to the assignor's personal injury. We should do no less here.

¶ 64. Upholding Hernandez's assignment of proceeds will assist those who are in need of medical care, but are unable to pay for it at the time that it is provided. Wisconsin permits assignments of proceeds from personal injury claims, in the nature of contingency fee agreements, in order to obtain legal services.[5] I see no reason why an assignment to obtain chiropractic services should be precluded here, as the need for the medical care arose out of the same accident as did the need for legal services. Accordingly, I conclude that the plain terms of the agreement between Hernandez and Yorgan assigned an interest to Yorgan in the proceeds received from Hernandez's personal injury claim. Because the assignment is capped by the amount of the charges for the medical care that Hernandez needed and received because of the automobile accident that forms the basis for the settlement Durkin received, it is neither champertous under Wisconsin law, Wis. Stat. § 895.375, nor is it against public policy under Wisconsin law. *D'Angelo,* 19 Wis. 2d at 398–99.

[5] That is how Durkin paid himself in this case.

702

## C. Liens

¶ 65. Liens can be equitable, *see O'Connell v. O'Connell,* 2005 WI App 51, ¶ 13, 279 Wis. 2d 406, 694 N.W.2d 429, contractual, *see Yates v. Weinhardt,* 224 Wis. 496, 502, 272 N.W. 347 (1937), or statutory, *see, e.g.,* Wis. Stat. § 757.36. An equitable lien can arise when the following elements are present: (1) "a debt, duty or obligation owing by one person to another"; (2) a "res to which that obligation fastens"; and (3) a "written contract[] showing an intention to charge some particular property with the payment of a debt." *O'Connell,* 279 Wis. 2d 406, ¶ 13 (quoting *McIntyre,* 68 Wis. 2d at 602).

¶ 66. In *O'Connell,* a prior owner of land, Gerald, sued to recover a greater share of the proceeds from the sale of the land than the other owners, Emmett and David, received because of additional work Gerald performed, which he claimed increased the sale price. *O'Connell,* 279 Wis. 2d 406, ¶ 17. The defense to Gerald's claim was that it should have been brought before the property sold. *Id.,* ¶ 18. The court of appeals concluded that Gerald's claim for an equitable lien on the proceeds did not have to be brought until the sale proceeds were received; and therefore, he could seek disproportionate reimbursement from the proceeds pursuant to Wis. Stat. § 842.02. *Id.* Under Wisconsin law, "an equitable lien relates back to the time it was created" by the parties' conduct. *See In re Stoffregen,* 206 B.R. 939, 944 (Bankr. E.D. Wis. 1997).

¶ 67. Here, all the elements necessary for an equitable lien to attach to the settlement proceeds are present. First, it is undisputed that Hernandez had a debt to Yorgan for the chiropractic services he provided at the time that Hernandez's personal injury claim

703

settled. Second, it is undisputed that settlement proceeds were obtained from Hernandez's personal injury claim and that the medical care Yorgan provided as a result of Hernandez's injury in the accident played a part in that settlement. Third, it is undisputed that Hernandez executed a written document that purported to assign her interest in the settlement proceeds and to create a lien on those proceeds, to the extent of the debt for the chiropractic services Yorgan provided.[6] Therefore, the only ways in which Yorgan would not have an equitable lien that is legally enforceable against the settlement proceeds is if the lien Hernandez granted to secure payment of the assignment did not attach to the settlement proceeds or it was not lawful in Wisconsin for some other reason.

¶ 68. I begin by examining whether proceeds to be received from a personal injury claim can constitute a "res" to which an equitable lien can attach. In *Riegleman,* the court of appeals held that a very similarly stated agreement did not create an equitable lien because "there is no evidence that the personal benefit [Krieg] derived from the [medical] services provided by [the chiropractor] enhanced the value of the insurance settlement proceeds." *Riegleman,* 271 Wis. 2d 798, ¶ 25 n.4 (quoting *In re Harris,* 50 B.R. 157, 160 (Bankr. E.D. Wis. 1985)). The court of appeals' conclusion is erroneous for two reasons. First, the lien in *Riegleman* was a contractual lien, as well as an equitable lien, yet the

_____

[6] The agreement provides:

I further hereby give [a] lien on my case to Dr. Yorgan against any and all proceeds of my settlement, judgement or verdict which may be paid to you, my attorney, or myself as a result of the injuries and health problems for which I have been treated or in connection thereto.

704

court ignored that basis for enforcement.[7] Second, an equitable lien arises under Wisconsin law when there is a written contract that demonstrates the parties' intent to satisfy a debt from a particular property. *McIntyre*, 68 Wis. 2d at 602. Although contribution to an increase in value of the asset to which the lien attaches can be a rationale for creation of an equitable lien, it is not a prerequisite. *O'Connor*, 279 Wis. 2d 406, ¶ 13.

¶ 69. A review of *McIntyre* is helpful to my analysis. There, a son and a mother had an agreement that at the time the mother sold her property, the son would receive a sum from the sale proceeds. *McIntyre*, 68 Wis. 2d at 599. We analyzed whether the son had an equitable lien that could be enforced against subsequent purchasers. *Id.* at 600–03. We concluded that there was no equitable lien because at the time that the interest was conveyed, the mother did not owe the son for a debt then in existence. *Id.* at 602. Therefore, an element necessary to creating an equitable lien was not present, and accordingly, there was no enforceable lien. *Id.* at 602–03.

¶ 70. However, before reaching that conclusion, we discussed some of the arguments advanced by the parties. We concluded that although some liens are controlled by specific statutes that detail how lien priorities are to be ordered and how the right to pursue them arises, Wisconsin courts have recognized that notice of an existing lien given to a third party to whom the property is transferred can make that lien enforceable against the property after the transfer. *See id.* at 600–01; *see also Carefree Homes, Inc. v. Prod. Credit Ass'n of Madison*, 81 Wis. 2d 541, 551–54, 260 N.W.2d 759 (1978).

---

[7] I discuss the contractual nature of Yorgan's lien below.

¶ 71. In my view, the reasoning in *Berkowitz v. Haigood,* 606 A.2d 1157, 1159–60 (N.J. Super. Ct. Law Div. 1992),[8] is persuasive (concluding that where a patient made a clear and unequivocal assignment and gave a lien on future litigation proceeds to the treating chiropractor, and the attorney had knowledge of that lien, the lien was enforceable).[9] In *Berkowitz,* the attorney who handled the lawsuit did not sign the documents that purported to create an assignment of and a lien against the proceeds from a personal injury claim. Notwithstanding the lack of the attorney's signature, the court held the lien valid by using the following principles to analyze it: (1) settlement proceeds and proceeds derived from a judgment for a personal injury claim are assignable; (2) a valid assignment must contain clear evidence of the intent to transfer the person's rights and " 'the subject matter of the assignment must be described sufficiently to make it capable of being readily identified' "; (3) "[t]he assignment must be clear and unequivocal in order to be effective as to the obligor"; (4) "the obligor must be properly notified of the existence of the assignment"; and (5) when "notified of the assignment, the obligor is charged with the duty to pay the assignee," thereby giving effect to the lien on the proceeds. *Berkowitz,* 606 A.2d at 1159 (quotation and citations omitted).

---

[8] The majority opinion begins its discussion with *Riegleman v. Krieg,* 2004 WI App 85, 271 Wis. 2d 798, 679 N.W.2d 857. Majority op., ¶¶ 10–12. *Berkowitz v. Haigood,* 606 A.2d 1157 (N.J. Super. Ct. Law Div. 1992), is the New Jersey case relied upon by *Riegleman.* However, as noted above, the court of appeals did not adequately employ *Berkowitz*'s reasoning.

[9] *See also In re Carroll,* 89 B.R. 1007, 1009 (Bankr. N.D. Ga. 1988) (holding that patient's assignment of, and grant of a lien on, proceeds from personal injury claim to treating doctor was enforceable).

¶ 72. All of the factors identified in *Berkowitz* are present here. First, the settlement proceeds from Hernandez's claim were assignable under Wisconsin law. Second, the plain wording of the contract between Yorgan and Hernandez evinces a clear intent to transfer Hernandez's rights in the settlement proceeds to the extent of the medical care Yorgan provided. Third, the unambiguous language of the assignment was clear and unequivocal. Fourth, Durkin was properly notified of the existence of the assignment and the lien through the copy of the contract he was provided more than two years before he settled Hernandez's lawsuit. Fifth, once notified of the assignment and lien, Durkin became an obligor with respect to his handling of the settlement proceeds.

¶ 73. In my view Yorgan also had a contractual lien. The contractual lien given here is little different from the lien one gives to a bank in the form of a mortgage in exchange for money to purchase a home.[10] What is necessary is offer, acceptance, consideration and a clear intent to place a lien on a particular property. *Yates*, 224 Wis. at 500–02. On its face, the contract between Hernandez and Yorgan satisfies the requirements necessary to creating a contractual lien. Also, Durkin does not claim that any of the elements necessary to creation of a contractual lien are missing here, nor does he assert that he did not have notice of the lien. Accordingly, under either the theory of an equitable lien or the theory that Yorgan had a contrac-

---

[10] *See Citizens Loan & Trust Co. v. Witte*, 110 Wis. 545, 545–46, 86 N.W. 173 (1901) (concluding that a mortgagee had a claim to foreclose the lien created by a mortgage on a property that was sold by the mortgagor, even though the property was no longer in the possession of the mortgagor).

tual lien, Yorgan had a lien against the settlement proceeds that Durkin received.

¶ 74. Durkin was not free to deal with the settlement proceeds as though no lien existed. According to these facts, Yorgan had the right to enforce the lien against the settlement proceeds before Hernandez or Durkin was paid from them. *See Stoffregen,* 206 B.R. at 944. When Durkin distributed the settlement proceeds to himself and to Hernandez, he did what he had no lawful right to do.[11]

¶ 75. The majority opinion begins its analysis by looking to *Riegleman.* It points out a difference between the facts of *Riegleman,* and those of the case at bar: in *Riegleman,* the attorney signed the agreement and thereby assented to the terms of the agreement. Majority op., ¶ 14. Here, Durkin did not sign the agreement between Hernandez and Yorgan. However, *Riegleman* does not suggest that the signature of an attorney is necessary to concluding that an assignment is valid, but rather, it applied a basic contracts analysis that first determined whether the attorney was a party to the contract to pay the chiropractor, and then it addressed the obligations that followed from its initial conclusion. *Riegleman,* 271 Wis. 2d 798, ¶ 27. And, as explained above, *Riegleman* relied on *Berkowitz* where the assignment was *not* signed by the attorney. *Id.,* ¶ 28. However, the focus of this case is not whether Durkin contracted to pay Yorgan. Rather, the case turns on the legal sufficiency of Hernandez's contract with Yorgan, which assigned him an interest in the settlement pro-

---

[11] In *Riegleman,* the court of appeals clearly instructed that when there is a dispute as to how settlement proceeds are to be distributed, the better choice is to seek declaratory judgment from the circuit court. *Riegleman,* 271 Wis. 2d 798, ¶ 36. Durkin ignored this wise advice at his peril.

ceeds and gave him a lien on those proceeds to secure payment for the medical care she received.

¶ 76. The majority provides three reasons for concluding that Yorgan's lien was not enforceable. I address them in turn. The majority first concludes that it is inappropriate to permit Yorgan to enforce his lien against Durkin because it was Hernandez, and not Durkin, who was unjustly enriched. Majority op., ¶ 39. The majority opinion places undue weight on that consideration. As we have shown and as the majority acknowledges, there is an accepted three-part test that courts are to apply to conclude that an equitable lien has been established; unjust enrichment is not required to establish an equitable lien. To the contrary, we have on multiple occasions analyzed lien claims and unjust enrichment claims in the same case with separate and distinct reasoning. *See Carefree Homes,* 81 Wis. 2d at 545–49; *see also Rock River Lumber Corp. v. Universal Mortgage Corp. of Wis.,* 82 Wis. 2d 235, 239–41, 262 N.W.2d 114 (1978); *S&M Rotogravure Serv. v. Baer,* 77 Wis. 2d 454, 461–63, 252 N.W.2d 913 (1977).

¶ 77. The majority also concludes that enforcing an equitable lien in this matter "would seem to circumvent the general rule against attorney non-liability to third parties." Majority op., ¶ 39. I disagree. The policy of attorney non-liability to third parties has nothing to do with whether Yorgan has an equitable or contractual lien that is enforceable *against the proceeds* from Hernandez's settlement. The majority opinion's reliance on this theory is misplaced because allowing Yorgan to enforce a lien against the settlement proceeds that Durkin received is little different from permitting enforcement against settlement proceeds in the hands of an insurance company who has notice of an assignment and lien on them. *See Associated Hosp. Serv., Inc.*

709

*v. Milwaukee Auto. Mut. Ins. Co.*, 33 Wis. 2d 170, 173–74, 147 N.W.2d 225 (1967) (concluding that a contract which provided for repayment of medical expenses paid on behalf of an insured, from any recovery obtained from a third party, was valid). In either case, when the holder of the funds is on notice of a claim to their ownership, it can pay the funds into court and ask for a declaratory judgment sorting out how the proceeds are to be distributed.

¶ 78. Finally, the majority explains that the enforcement of a lien against the proceeds Durkin received would circumvent the legislature's policy choice as reflected in existing statutory lien provisions for health care providers, which do not cover the situation before us. Majority op., ¶ 40. The majority's conclusion is that if the legislature intended a claim like Yorgan's to be enforceable under a lien theory, the legislature would have drafted a statute that addressed such a claim. I disagree that the legislature's creation of the statutory provision that provides for certain liens precludes a broader common law or equitable claim. *See Stasey v. Miller*, 168 Wis. 2d 37, 60, 483 N.W.2d 221 (1992) (stating that "[t]his court has recognized the existence, independent of statute, of common law charging liens that secure an attorney's payment from the proceeds of a judgment" (footnote and citations omitted)).

¶ 79. As I explained earlier, public policy considerations strongly bolster the outcome that I advance. Yorgan provided needed medical care to a patient who was not able to pay for the care at the moment when she was most in need of care. The need for medical care arose out of the same accident as did the settlement proceeds. As is the case in most personal injury cases, Hernandez did not receive compensation immediately

710

after the accident. This was despite the fact that she chose to settle short of trial. Without the promise to pay Yorgan from what she expected to receive from her claim, Hernandez was unable to pay for the care she received. Furthermore, as the majority itself acknowledges, it is not good policy to discourage health care providers from entering into agreements with patients for deferred payment. In a day and age when health care is expensive and options for the uninsured are few, that is a troubling outcome. In my view, other public policy reasons cited by the majority in support of its decision do not outweigh these pressing concerns.

## II. CONCLUSION

¶ 80. Because the need for medical care arose out of the same accident as did the settlement proceeds and there is no evidence in the record that Hernandez provided Durkin any instructions about the disbursement of the settlement proceeds to Yorgan that were contrary to the assignment she executed in favor of Yorgan, I conclude that Hernandez validly assigned to Yorgan settlement proceeds from her personal injury claim, up to the amount of the charges for the chiropractic treatments Yorgan provided to Hernandez. I also conclude that Hernandez granted Yorgan a lien to secure payment of the debt for which the assignment was made, and that the lien can be enforced against the settlement proceeds because Yorgan's lien existed before Durkin had any right to retain a portion of the proceeds and Durkin had knowledge of both the assignment and Yorgan's lien. Accordingly, I would permit Yorgan to recover from Durkin to the extent of the settlement proceeds Durkin received or the amount due

to Yorgan for the chiropractic care he provided to Hernandez, whichever is smaller. Therefore, I respectfully dissent.

¶ 81. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins this dissent.