Paul D. RIEGLEMAN, D.C., Plaintiff-Respondent,

v.

Eric J. KRIEG and Warshafsky, Rotter, Tarnoff,
Reinhardt & Bloch, S.C., Defendants-Appellants.†

Court of Appeals

*No. 03–1826. Submitted on briefs December 5, 2003.—Decided
March 17, 2004.*

2004 WI App 85

(Also reported in 679 N.W.2d 857.)

† Petition to review denied 6-8-04.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Ann S. Jacobs* and *Aaron J. Bernstein* of *Warshafsky, Rotter, Tarnoff, Reinhardt & Bloch, S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Dan A. Riegleman* and *Amy M. Bates* of *Riegleman Law Offices, S.C.*, Sussex.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. ANDERSON, P.J. Eric J. Krieg and the law firm of Warshafsky, Rotter, Tarnoff, Reinhardt & Bloch, S.C. (the Warshafsky law firm) appeal from a judgment of the circuit court denying their summary judgment motion and holding, after a two-day trial, that Krieg's chiroprator, Paul D. Riegleman, D.C., was entitled to

payment for his medical services. The court determined that Riegleman met his burden of proof that the medical expenses incurred by Krieg as a result of treatment provided by Riegleman were reasonable and necessary. The court also determined that the Warshafsky law firm entered into a written contract binding Krieg and the firm jointly and severally to protect the outstanding balance claimed due and owing by Riegleman. The court concluded that Riegleman was entitled to judgment in the amount of $5000. We agree and affirm.

¶ 2. Krieg was involved in a work-related automobile accident on July 15, 1997. He retained the services of the Warshafsky law firm to represent him in his personal injury claim.[1] Riegleman provided chiropractic treatment to Krieg for approximately three years after his accident. Riegleman's total treatment bill exceeded $19,000. Over this time, Riegleman testified that Krieg reported that his pain and health condition improved with chiropractic care. On March 7, 2000, the second to last day Krieg received treatment from Riegleman, Krieg signed a "Doctor's Lien" document. Attorney Victor C. Harding of the Warshafsky law firm also signed the document on March 9, 2000. The document is the subject of the underlying small claims action and this appeal. It states in pertinent part:

> I do hereby authorize the above doctor to furnish you, my attorney, with a full report of his case history, examination, diagnosis, treatment, and prognosis of myself in regard to the accident in which I was involved in . . . .

> I hereby give a lien to said doctor on any settlement, judgment, or verdict as a result of said accident, and

---

[1] Initially, Krieg hired an attorney from a different firm who subsequently retired.

authorize and direct you, my attorney, to pay directly to said doctor such sums as may be due and owing him for service rendered me, and to withhold such sums from such settlement, judgment, or verdict as may be necessary to protect said doctor adequately.

[dated and signed by Krieg]

The undersigned, being attorney of record for the above patient does hereby acknowledge receipt of the above lien, and does agree to honor the same to protect adequately said above named doctor.

[dated and signed by an attorney from the Warshafsky firm]

¶ 3. In October 2001, Krieg's personal injury case ultimately settled in mediation. Krieg's worker's compensation carrier retained an orthopedic surgeon, Dr. Richard Karr, to perform an independent medical examination. Karr's report stated that Krieg's treatment by Riegleman was excessive, contrary to reasonable standards of care, unnecessary, and potentially deleterious to Krieg's health. Karr's report also stated that he believed Krieg had reached "an end of healing no later than 8 months post-injury, i.e. no later than 3/15/98. Any treatments subsequent to that date had not been made necessary by the 7/15/97 injury." After Karr's report, the insurance company reimbursed Riegleman for $13,210.55. It denied payment of $5640.84, which was the bill for treatment after Krieg's perceived end of healing date. After the insurance company reimbursed Riegleman, the balance of the settlement was paid to the Warshafsky law firm, which deposited it into its trust account.

¶ 4. Sometime after the insurance company's payment decision, Krieg said he "came to realize the enormity and uncustomary amount" of the chiropractic

charges for the treatments he received. He now refused to release from his settlement funds the remaining $5640.84 that Riegleman claimed due and owing. Instead, Krieg directed his attorney to pay that money directly to him.

¶ 5. On October 2, 2001, the Warshafsky law firm notified Riegleman that Krieg's case had settled and that based on Karr's report, Krieg and the firm did not believe that the firm was obligated to protect the lien because the treatment charges after March 10, 1997, are not related to Krieg's accident. The Warshafsky law firm informed Riegleman that although it would not remit the remaining amount it had put aside in its trust account, it would hold it for thirty days to allow Riegleman time to take what steps he deemed necessary to protect his lien.

¶ 6. Riegleman subsequently consulted with counsel and authorized communication with the Warshafsky law firm, which lasted approximately ten weeks. During this time, the Warshafsky law firm gave Riegleman several "deadlines" to "start the appropriate legal action to protect his lien." Riegleman's attorney expressly requested that the Warshafsky law firm retain the disputed funds in trust pending the filing of litigation if the parties could not settle the matter.

¶ 7. No legal action had been taken by January 31, 2002, and on that date, the Warshafsky law firm disbursed the funds held in trust to Krieg. On February 8, 2002, Riegleman filed a small claims summons and complaint against Krieg and the Warshafsky law firm.[2]

¶ 8. As to Krieg, the complaint alleged that Riegleman's treatment was reasonable and appropriate

---

[2] This case was converted to a three-judge panel by order of the chief judge.

and that Krieg owed the remaining balance (limited to the $5000 limit of small claims actions).

¶ 9. As to the Warshafsky law firm, Riegleman alleged, among other things, that the firm entered into a written contract binding Krieg and the firm jointly and severally to protect the outstanding balance claimed by Riegleman. The complaint further alleged that the Warshafsky law firm refused to honor its contractual obligations and is therefore in breach of the lien. Riegleman requested judgment against Krieg and the Warshafsky law firm, jointly and severally, for $5000 plus costs and attorneys fees.

¶ 10. The Warshafsky law firm answered the complaint on behalf of itself and Krieg denying, among other things, that the care Krieg received was reasonable or necessary, that the lien was binding on either defendant jointly and severally, and alleging, as an affirmative defense, that the plaintiff's action was barred by the doctrine of laches.

¶ 11. After a two-day trial, the court issued a decision holding that Riegleman met his burden of proof that the expenses incurred were reasonable and necessary and that the "Doctor's Lien" document was an enforceable contract thereby entitling him to judgment against Krieg and the Warshafsky law firm jointly and severally for $5000.

¶ 12. The court balanced the testimony of two chiropractors against the report of an orthopedic doctor retained specifically to perform an examination on behalf of the insurance company and concluded that the chiropractors' testimonies were more credible. Reigleman testified that he believed Krieg had reached his "healing plateau" somewhere during the summer of 1998. He said that with a soft tissue injury, the healing plateau is approximately one year postaccident. Riegle-

man said that at the time Krieg reached his healing plateau, Riegleman discussed further treatment options, including types other than chiropractic care. Riegleman said he knew that Krieg had tried physical therapy and reported that he was not very happy with this. Riegleman testified that Krieg chose to continue with "maintenance care" and came in for care about once a month. Riegleman testified that this sort of maintenance care is "absolutely" beneficial even though "[a]fter you hit a healing plateau . . . the soft tissues are no longer going to alter." He explained that "adjustments after a plateau are certainly effective in trying to restore as much function as possible, keep as much motion in the spine, and decrease pain for the patient."

¶ 13. Chiropractor Peter Heffernan testified that his "take" on chiropractic care beyond a healing plateau was different than the orthopedic doctor's take. He stated that "the literature is pretty supportive that soft tissue injuries will go through a repair process up to one year post trauma." He concluded that Krieg's chiropractic care after the healing plateau, which he believed was probably in June 1998, "afforded [Krieg] the greatest amount of relief, even though it was temporary."

¶ 14. In its decision, the court stated that it found it troubling that the Warshafsky law firm, at the time it was representing Krieg against the insurance company, took the position that Riegleman's chiropractic charges were reasonable and necessary and that all of the medical expenses were appropriately payable to Krieg and then, after the settlement, it took the opposite position, choosing to give Karr's opinion greater credibility than Riegleman's. Finally, the court noted that an attorney has an ethical obligation not to advance a claim if the attorney knows it is not supportable by the evidence; therefore, the court said, if it was clear to the

805

Warshafsky law firm that Krieg was being over-treated, no claim should have been made for those charges in the underlying personal injury case. The court stated, "Clearly, Mr. Krieg wants to have it both ways. He wants the money from the insurance company, but he does not want to pay for the services that he received."

¶ 15. With regard to the claim against the Warshafsky law firm, the issue of liability revolved around the enforceability of the "Doctor's Lien" document. The court held that both Krieg and the Warshafsky law firm did receive consideration for entering into the agreement. It held that it clearly was contemplated that, in addition to medical records, Riegleman was agreeing to furnish a report regarding the case, which could be used in pursuing the claim. In addition, Riegleman was agreeing that Krieg would receive continued treatment, with the expectation that the bills would be paid at a later date. It noted that the Warshafsky law firm specifically agreed to "honor the same (liens) to protect adequately said above named doctor." According to the trial court, this was clearly done at the request of and with the approval of the client, Krieg. In addition, the language agreed to by Krieg authorized payment "for services rendered to me."

¶ 16. The court noted that there was no limiting language referring to treatment for the accident and that, in short, Krieg agreed to have the chiropractor paid for his outstanding medical bills from any medical proceeds—and the Warshafsky law firm agreed to this as well. The court concluded that all these factors made the "Doctor's Lien" an enforceable contract.

¶ 17. The court went on to address what it considered "of greater concern": the obligation of the law firm to deal appropriately with the funds held in trust. The court noted that clearly an attorney's primary duty

806

is to his or her client. Here, Krieg told the Warshafsky law firm that he withdrew his consent to pay his medical bills. The question is: What is the attorney's duty to the parties at that point in time? The Warshafsky law firm's answer to this question was to adopt the position that the medical expenses incurred after the "end of healing" date given by the insurance company's expert were not related to the accident and the firm was therefore entitled to ignore the lien document.

¶ 18. The court determined that the Warshafsky law firm "arbitrarily" placed a deadline on Riegleman to commence an action to collect his bill or declare his rights telling Riegleman that if he did not do so, the money would be released to Krieg. The court then stated that the "real issue is who has the burden to bring the dispute to resolution." The court determined that the best way to resolve this dispute was by way of declaratory judgment pursuant to WIS. STAT. § 806.04 (2001–02).[3] The court noted that although counsel for the Warshafsky law firm correctly pointed this out, it incorrectly made the assumption that the claimant, Riegleman, has the duty to bring the declaratory judgment action. The court said that this assumption is contrary to the language in SCR 20:1.15(d), which requires that the funds be held in trust "until the dispute is resolved."

¶ 19. The court concluded that had the Warshafsky law firm not wanted to hold the funds indefinitely, it could have, and should have, brought an action for declaratory judgment and sought guidance from the court as to who was entitled to the disputed funds. The court opined that this was not done, and that the

---

[3] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

disbursing of the funds, contrary to the signed agreement, may have deprived Riegleman of the opportunity to collect those funds from Krieg. The court held that the expenses incurred were reasonable and necessary and that the "Doctor's Lien" document was an enforceable contract thereby entitling Riegleman to judgment against Krieg and the Warshafsky law firm jointly and severally for $5000. Krieg and the Warshafsky law firm appeal.

¶ 20. In evaluating a breach of contract claim, we must first determine whether a valid contract exists. *Pasko v. City of Milwaukee*, 222 Wis. 2d 274, 279, 588 N.W.2d 642 (Ct. App. 1998). If a valid contract exists, we then must determine whether a party has violated its terms, and whether any such violation is material such that it has resulted in damages. *Id.* Contracts are construed to achieve the parties' intent. *Goldstein v. Lindner*, 2002 WI App 122, ¶ 12, 254 Wis. 2d 673, 648 N.W.2d 892, *review denied,* 2002 WI 121, 257 Wis. 2d 119, 653 N.W.2d 890 (Wis. Sept. 3, 2002) (No. 01–2068). The terms used in a contract are to be given their plain or ordinary meaning. *Id.* The analysis ends if the words convey a clear and unambiguous meaning. *Id.* "If [the parties'] intent can be determined with reasonable certainty from the face of the contract itself, there is no need to resort to extrinsic evidence." *Id.* (citation omitted). When the contract is unambiguous, determining its meaning presents a question of law we review de novo. *Pasko*, 222 Wis. at 279.

¶ 21. We review any factual determinations made by the trial court in the course of reaching a reasonableness determination under the clearly erroneous standard. Wis. Stat. § 805.17(2). Section 805.17(2) states in part that "[f]indings of fact shall not be set

aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

¶ 22. Initially, we dispose of Krieg and the Warshafsky law firm's argument that the actions against them are barred by the doctrine of laches. "For laches to bar a claim, an unreasonable delay must occur, the plaintiff must know the facts and take no action, the defendant must not know the plaintiff would assert the right on which the suit is based, and prejudice to the defendant must occur." *Policemen's Annuity v. City of Milwaukee*, 2001 WI App 144, ¶ 20, 246 Wis. 2d 196, 630 N.W.2d 236 (citation omitted). Whether the doctrine of laches applies is fact specific. *Id.* The facts in this case do not support the application of the doctrine because the parties were in discussion throughout the ten-week period before the filing of the small claims action.

¶ 23. That determined, we address Riegleman's underlying claim that the medical expenses incurred by Krieg as a result of treatment provided by Riegleman were reasonable and necessary and that the Warshafsky law firm entered into a written contract binding Krieg and the firm jointly and severally to protect the outstanding balance claimed due and owing by Riegleman.

¶ 24. First, we hold that the trial court did not err in its determination that the medical expenses for treatment provided by Riegleman were reasonable and necessary. The court balanced the testimony of two chiropractors against the report of an orthopedic doctor and concluded that the chiropractors' testimonies were more credible. We are obligated to give due regard to the trial court's ability to judge the credibility of the

witnesses and weigh it against other evidence. *See* WIS. STAT. § 805.17(2). In so doing, we cannot say that the trial court's determination upon this record is clearly erroneous.

¶ 25. Next, we hold that the document at the center of this controversy is a valid contract, which conveys an assignment.[4] The question of how to classify this type of document is an issue that has not yet been fully addressed in Wisconsin. However, our research reveals that the prevailing trend is for courts to hold that this type of document—i.e., the type containing language agreeing to protect a medical provider's right to payment for services from any insurance settlement—is a valid contract which creates an assignment and entitles the medical provider (the assignee) the right of contractual enforcement against both the patient (the assignor) and the patient's lawyer.

---

[4] We also hold that this document does not create a common law or "equitable lien" as Riegleman asserts. In *Matter of Harris*, 50 B.R. 157, 160 (E.D. Wis. 1985), the bankruptcy court applied Wisconsin law and found that while a doctor could have a common-law lien on the proceeds of a patient's insurance settlement, it was not present in that case for two reasons: (1) the lien claimants never had possession of the insurance settlement proceeds—the key requirement for obtaining a common-law lien; (2) there was "no evidence that the personal benefit the debtor derived from the services provided by [the doctor] enhanced the value of the insurance settlement proceeds." *Id.*

Similarly, a requirement for a common-law lien is missing in the case at hand: "there is no evidence that the personal benefit [Krieg] derived from the [medical] services provided by [the chiropractor] enhanced the value of the insurance settlement proceeds." *See id.* Consequently, like the court in *Harris*, we conclude that Riegleman does not have a common-law lien in the insurance settlement proceeds.

810

¶ 26. WISCONSIN STAT. § 402.210(5) explains:

> An assignment . . . of "all my rights under the contract" or an assignment in similar general terms is an ·assignment of rights and . . . it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by the assignee to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract.

¶ 27. Krieg authorized and directed the Warshafsky law firm "to pay directly to [Riegleman] such sums as may be due and owing him for service rendered [Krieg], and to withhold such sums from such settlement, judgment, or verdict as may be necessary to protect [Riegleman] adequately." The language of the contract before us is unambiguous and contains an assignment by Krieg to Riegleman that the Warshafsky law firm was notified of and agreed to honor. We therefore agree with the trial court that the Warshafsky law firm and Krieg are jointly and severally liable for the medical fees due and owing Riegleman.

¶ 28. We are persuaded by the reasoning of state courts that have already addressed this issue. In *Berkowitz v. Haigood*, 606 A.2d 1157 (N.J. Super. L. 1992), a chiropractor sued a former patient and the patient's attorney for payment of medical bills. The document involved stated: "I hereby authorize and direct you, my attorney, to pay directly to said doctor such sums as may be due and owing him for medical service rendered me . . . ." *Id.* at 1158 n.1. Upon review of the language, the Law Division concluded that the attorney was liable under the circumstances because there was clear evidence of a valid assignment and the attorney had been properly notified of the assignment. *Id.* at 1159. The attorney was thus charged with the

duty to pay the assignee the amount of the undisputed medical bills and not pay such amount to his client, the assignor. *Id.*

¶ 29. *In re Moore*, 4 P.3d 664, 665 (N.M. 2000), a chiropractor filed a complaint that a lawyer failed to pay the bill for treatment provided to his client, despite having issued a letter stating payment would be made from the settlement. The pertinent language in the letter the lawyer sent the chiropractor stated:

> [Client] has requested that my office tender to your office a letter stating that payment of any bill for services she may incur will be made from settlement or ultimate judgment which [client] may receive as a result of the . . . automobile accident. It is understood that [client] will be ultimately responsible for the payment of any bill for services incurred with your office.

*Id.*

¶ 30. The lawyer denied to the chiropractor and later to disciplinary counsel that the letter in question obligated him to withhold funds to pay the chiropractor. *Id.* The lawyer contended that the letter only stated that his client would pay the bill from the settlement funds, although he acknowledged his letter was sent in response to a request for a letter of protection.[5] *Id.* The lawyer also argued that there was no assignment of proceeds and that without an unambiguous assign-

---

[5] "Letter of protection" is the customary nomenclature for a document by which a lawyer notifies a medical vendor that payment will be made when the case is settled or judgment is obtained. This is a common practice by which lawyers representing personal injury plaintiffs ensure clients will receive necessary medical treatment, even if unable to pay until the case is concluded. *In re Moore*, 4 P.3d 664, 665 n.1 (N.M. 2000).

ment, no individual responsibility for payment to the healthcare provider could be imposed upon him. *Id.* at 665–66.

¶ 31. The court held that the language of the letter the lawyer sent to the chiropractor clearly communicated that payment would be made "from settlement or ultimate judgment." *Id.* at 666. The fact that the letter ended by saying that the client would be ultimately responsible for payment did not change the message. *Id.* A client remains ultimately liable for paying the medical vendor, for example, when no recovery is received. *Id.* The essence of the letter and the language that obligated the lawyer to pay the vendor from the settlement proceeds was the statement that the client had asked him to communicate that payment would be made from settlement proceeds. *Id.* The court then cautioned:

> [I]f [the lawyer] sent this letter intending that the vendor rely upon it to continue to render care and to postpone collection efforts, while intending not to be obligated to dispense settlement proceeds to the vendor, a more serious question of misrepresentation and fraud could arise.

*Id.*

¶ 32. The *Moore* court concluded by addressing another issue present in the case before us. In response to the contention that the doctors were not paid because the client changed her mind, the court held that an attorney's obligation to abide by a client's directives "does not extend to assisting the client in defrauding courts and creditors." *Id.* (citation omitted); *see also Matter of Rawson*, 833 P.2d 235, 239 (N.M. 1992). The court held that if a lawyer decides to send such a letter, the lawyer should be reminded that, notwithstanding a

disclaimer, he or she has a continuing obligation not to engage in dishonest or fraudulent conduct or statements. *Moore,* 4 P.3d at 666.

¶ 33. In *Romero v. Earl,* 810 P.2d 808, 809 (N.M. 1991), the court again considered the effect of an agreement signed by the lawyer and the client granting to a doctor a lien on the proceeds of a personal injury suit. It held that once a lawyer has executed such *an assignment,* he or she is "obligated to distribute the proceeds of [the] claim in accordance with [it]," and that this obligation may be enforceable against the lawyer. *See id.*

¶ 34. The court in *Rawson* determined that formal assignment language is not essential to the creation of the obligation. *Rawson,* 833 P.2d at 238. In *Rawson,* the attorney sent letters to three doctors stating they would be paid from the proceeds of any recovery the client received. Although Rawson's letter did not contain formal assignment language, it did contain a promise to pay the doctors from the proceeds of the suit. *Id.* The court stated that "[t]he attorney in such a situation is obligated to distribute the proceeds of the settlement in accordance with the promise to the creditors . . . ." *Id.*

¶ 35. *Berkowitz, Moore, Romero* and *Rawson* are instructive and persuasive. Applying the reasoning of the above analyses to the case at bar, we hold that the document before us is an unambiguous contract creating an assignment that is enforceable under contract law. It shows in clear language its intent: Krieg authorized "my attorney, to pay directly to said doctor such sums as may be due and owing him for service rendered me, and to withhold such sums from such settlement, judgment, or verdict as may be necessary to protect said doctor adequately"; the Warshafsky law

814

firm agreed "to honor the (lien) to protect adequately said above named doctor." The document also communicates that Krieg and the Warshafsky law firm received consideration for entering into the agreement because Riegleman agreed to furnish medical records and a report regarding the case, which could be used in pursuing the claim; in addition, Riegleman agreed to provide continued treatment to Krieg, with the expectation that his bills would be paid at a later date.

¶ 36. We conclude with this instruction: If an attorney and client have signed an assignment in favor of a medical provider and a dispute arises over whether the amount owing is reasonable and necessary, and if the attorney does not want to hold funds indefinitely, he or she should bring an action for declaratory judgment pursuant to Wis. Stat. § 806.04[6] and seek guidance from the court as to who is entitled to the disputed funds. Specifically, the attorney should do the following:

---

[6] Wisconsin Stat. § 806.04, the Uniform declaratory judgments act, states in pertinent part:

(1) Scope. Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree, except that finality for purposes of filing an appeal as of right shall be determined in accordance with s. 808.03(1).

(2) Power to construe, etc. Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder. No party shall be denied the right to have declared the

1. Commence a declaratory judgment action under WIS. STAT. § 806.04 naming the patient as plaintiff and the medical care provider as defendant.

2. Deposit or file the disputed amount with the Clerk of Courts.

We note that the standard language of these assignments authorizes payment of a yet to be determined amount of money (i.e., authorizes the patient's attorney to pay directly to the medical provider *such sums as may be due and owing*). When an amount is yet to be determined, the trial court has the inherent authority to determine what is reasonable and necessary.

¶ 37. Finally, we offer these words of advice and caution to attorneys faced with similar circumstances: An attorney should not assume that he or she can ignore an assignment that he or she has agreed to honor simply because a client changes his or her mind about the assignment—to make such an assumption is contrary to rules of professional conduct, which require that disputed funds be held in trust "until the dispute is resolved." SCR 20:1.15(d). When dealing with an attorney, another person (whether an attorney or a lay person) has the right to expect that the attorney will be honest and straightforward. *See generally Moore*, 4 P.3d at 666. If an attorney signs a document intending that the medical provider rely upon it to continue to render care and to postpone collection efforts, while intending not to be obligated to dispense settlement proceeds to the medical provider, a more serious question of misrepresentation and fraud could arise. *Id.*

---

validity of any statute or municipal ordinance by virtue of the fact that the party holds a license or permit under such statutes or ordinances.

¶ 38. We affirm the court's decision to hold Krieg and the Warshafsky law firm jointly and severally liable to Riegleman in the amount of $5000 plus costs.

*By the Court.*—Judgment affirmed.