FROEDTERT MEMORIAL LUTHERAN HOSPITAL, INC.,
Plaintiff-Respondent,

v.

NATIONAL STATES INSURANCE COMPANY,
Defendant-Appellant,†

The LOREN LEDGER TRUST, Defendant-Respondent.

Court of Appeals

*No. 2007AP934. Submitted on briefs January 2, 2008.
—Decided March 18, 2008.*

2008 WI App 58

(Also reported in 750 N.W.2d 926.)

476

479

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Norman D. Farnam* and *John J. Laubmeier* of *Stroud, Willink & Howard, LLC* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Susan E. Lovern* and *Rachel N. Schepp* of *von Briesen & Roper, S.C.* of Milwaukee.

On behalf of the defendant, the cause was submitted on the brief of *Thomas M. Devine* of *Hostak, Henzl & Bichler, S.C.* of Racine.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J. National States Insurance Company (National States) appeals the award of summary judgment to Froedtert Memorial Lutheran Hospital, Inc. (Froedtert) and The Loren Ledger Trust, holding that the National States contract required it to pay the actual charges billed by Froedtert for inpatient hospital care of Kathleen Ledger after all of her Medicare Part A benefits had been exhausted, and to pay interest on the unpaid amount pursuant to Wis. Stat. § 628.46(1) (1999–2000).[1]

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

We conclude that summary judgment was proper because there were no material facts in dispute, and that National States' insurance contract required it to pay all of the hospital charges incurred by its insured for Medicare-eligible services after Medicare Part A benefits were exhausted, and affirm.

## BACKGROUND

¶ 2. Kathleen Ledger received a kidney transplant in May 2000.[2] From October 26, 2000, until her death on February 12, 2001, Kathleen received inpatient medical care and treatment at Froedtert. Before she was admitted to Froedtert on October 26, 2000, Kathleen's Medicare Part A coverage was exhausted, including her maximum lifetime benefits. However, on October 26, 2000, she was covered by the terms of a medical supplemental policy purchased from National States, entitled "Medicare Supplement Insurance."[3] The policy was issued in 1998. Policy language, which Froedtert and Ledger contend requires payment of *all* charges, and which National States contends requires *payment only of what Medicare would have paid* for these services if Medicare benefits had not been exhausted, states:

> BENEFITS AFTER MEDICARE STOPS – If maximum benefits have been paid under Medicare for in-patient hospital expense, including the lifetime reserve days,

---

[2] Kathleen Ledger passed away in 2001. Her husband, Loren Ledger, passed away in October 2006. The Trust was then substituted as an additional party defendant. All references to "Ledger" apply to Kathleen, Loren and the Ledger Trust collectively unless otherwise specified.

[3] This policy is frequently referred to by the parties and relevant administrative agencies as Medigap coverage.

we will pay *all further expense incurred for hospital confinement that would have been covered by Medicare Part A.*

(Capitalization in original; italics added.)

¶ 3. Upon admission to Froedtert, Kathleen signed a Conditions of Admission form which covered the treatment at issue here. The relevant language, entitled "Financial Agreement *and Assignment*," is undisputed.

I, the undersigned agree, whether signing as agent or as patient, that I am financially responsible for all charges incurred. *Assignment of commercial insurance benefits* to the Hospital does not reduce the responsibility for payment . . . . Further, by signing below, I authorize payment to be made directly to FROEDTERT MEMO-RIAL LUTHERAN HOSPITAL and/or FACULTY PHYSICANS AND SURGEONS for the benefits otherwise payable to me by any third party including major medical benefits.

(Capitalization in original; italics added.)

¶ 4. National States argues that the language of this clause does not give Froedtert standing to sue for the balance due on Ledger's bill because there was never a proper assignment to Froedtert of Ledger's right to any insurance proceeds, and because Ledger never specifically assigned her Medicare supplement insurance benefits to Froedtert.

¶ 5. The bill for Kathleen's medical care at Froedtert from October 26, 2000 through February 12, 2001, was $267,074.93. Of this amount, $60,240.05 related to charges associated with services covered by Medicare Part B[4] for which Ledger made a co-payment of $2,800.00. National States paid $73,309.25, which rep-

[4] Charges related to Medicare Part B are not claimed to be due from National States and are material to this matter only

resents the amount Medicare would have paid Froedtert for the services to Kathleen had Medicare Part A not been exhausted. The remaining balance of Froedtert's charges is $130,725.63.

¶ 6. When National States refused to pay the outstanding balance of the Froedtert bill, Loren complained to the Wisconsin Office of the Commissioner of Insurance (OCI). National States consistently claimed that it had paid all it owed under its policy. Twice, the OCI informed National States that its interpretation of its policy was wrong. On July 1, 2003, the OCI wrote to National States saying:

> In your response to Mr. Ledger[']s complaint you stated payment was made based on hospital confinement that would have been covered by Medicare Part A. That is not what you did. You made payment on what Medicare would have paid had the service been approved by Medicare. The language in the policy says something quite different. The language in the policy does not mention how claims are paid, it mentions hospital confinement that would have been <u>covered</u> by Medicare Part A. This claim should be paid at the actual charge.

(Underlining in original.)

¶ 7. National States refused to change its position. It continued to insist, as it does here, that it owes only what Medicare would have paid, and that its analysis is supported in current federal regulations which direct states to follow the National Association of Insurance Commissioners' (NAIC) Model Regulations for Medigap coverage. National States asserts that Wisconsin was required by federal law to follow the NAIC Model Regulations for Medigap insurance, and

insofar as these items explain reduction of the bill independent of payments made by National States or Ledger.

that Froedtert was violating Medicare law when it charged more than the Medicare reimbursement rate for these services.

¶ 8. However, Wisconsin and three other states were given waivers from application of that law because they had standardized their Medigap policy requirements *before* the federal legislation was enacted. *See* 42 U.S.C. § 1395ss(p)(1)(E), (p)(6) (2004); 63 Fed. Reg. 67,078, 67,079 (Dec. 4, 1998); 65 Fed. Reg. 18,999, 18,999 n.1 (Apr. 10, 2000). On December 23, 2004, the OIC explained to National States that the NAIC Model Regulations were not the law in Wisconsin.

> It does not appear that language in the NAIC model is valid in this scenario. OIC did not incorporate into its rule at the time of this claim that a provider was not permitted to bill the Medicare recipient at a higher rate than Medicare was paying at the time Medicare's' [sic] benefits were exhausted. Because this language is in the model regulation, does not mean it has to be incorporated into Wisconsin's' [sic] rule.

¶ 9. National States, in January 5, 2005 correspondence, repeating its already rejected analysis of its policy obligation, but acknowledging that Wisconsin was exempted from the federal regulations on which National States relied, advised Froedtert:

> [W]e have already paid the maximum under our policy for the claim in question. The policy language specifies that we will pay all further expense that would have been covered by Medicare following the exhaustion of Medicare benefits. We have performed in accordance with the contract by paying the expenses that would have been covered by Medicare.
>
> . . . .

> We do not believe that the waiver granted to Wisconsin from complying with Federal Standards for Medicare supplements was intended to result in either higher hospital costs or higher insurance costs for Wisconsin residents.

Froedtert thereafter commenced this action.

¶ 10. The trial court rejected National States' argument that Froedtert had no standing to sue, found that National States had not raised material facts which dispute Froedtert's bill, and awarded summary judgment to Froedtert for the balance due, rejecting National States' claim that Froedtert could not legally charge more than what Medicare would have paid if its benefits had not been exhausted[5] and further rejecting National States' claim that the language of its insurance policy limited National States' liability to the amount Medicare would have paid for the services provided if the benefits had not been exhausted. Judgment was entered for the amount due. The trial court also awarded statutory interest at twelve percent, pursuant to Wis. Stat. § 628.46(1) (1999–2000). National States appeals.

---

[5] National States insisted at the trial court, and continues to insist before this court, that this case is about "balance billing," a practice under which, contrary to applicable federal regulations, a patient covered by Medicare is billed for the difference between what Medicare paid and what the hospital actually charged for services. This is not a Medicare case. This is an insurance policy case. At the time the charges here were incurred, Kathleen had exhausted all of her Medicare Part A lifetime benefits, thus Medicare Part A had no obligation to pay anything. Under Wisconsin law, Froedtert had no obligation to charge only what Medicare would have paid if it still had any obligation to pay. National States' continued repetition of this inapplicable argument, based on law that was not in effect at the time the policy was sold or at the time the claim was made, is curious.

## STANDARD OF REVIEW

¶ 11. In reviewing the grant or denial of a summary judgment, we apply the same methodology as the trial court and review *de novo* the grant or denial of summary judgment. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). That methodology is well-established and we will not repeat it here. *See, e.g., Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. Summary judgment is proper if there are no genuine issues of material fact and one party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2).

¶ 12. Contract interpretation is a question of law we review *de novo*. *Edwards v. Petrone*, 160 Wis. 2d 255, 258, 465 N.W.2d 847 (Ct. App. 1990); *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 460, 405 N.W.2d 354 (Ct. App. 1987). The interpretation of terms and clauses in an insurance contract is a question of law. *Kremers-Urban Co. v. American Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d. 156 (1984). The objective in interpreting an insurance contract is to ascertain the parties' intent. *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI33, ¶ 16, 261 Wis. 2d 4, 660 N.W.2d 666. Insurance contracts are to be construed from the standpoint of an ordinary person. *Cieslewicz v. Mutual Serv. Cas. Ins. Co.*, 84 Wis. 2d 91, 97–98, 267 N.W.2d 595 (1978). Where possible, courts will "enforce plain and unambiguous policy language as written." *State v. City of Rhinelander*, 2003 WI App 87, ¶ 5, 263 Wis. 2d 311, 661 N.W.2d 509. "As a general rule, the language in an insurance contract is given its common, ordinary meaning, that is, what the reasonable person in the position

of the insured would have understood the words to mean." *Folkman v. Quamme*, 2003 WI 116, ¶ 17, 264 Wis. 2d 617, 665 N.W.2d 857 (citations and internal quotations omitted).

¶ 13. To the extent an insurance contract is ambiguous, the ambiguity is to be construed against the insurer and in favor of coverage. *Kaun v. Industrial Fire & Cas. Ins. Co.*, 148 Wis. 2d 662, 669, 436 N.W.2d 321 (1989); *see also State Farm Mut. Auto. Ins. Co. v. Langridge*, 2004 WI 113, ¶ 15, 275 Wis. 2d 35, 683 N.W.2d 75. "Language in a contract is ambiguous only when it is 'reasonably or fairly susceptible of more than one construction.' " *Teacher Ret. Sys. of Texas v. Badger XVI Ltd. P'ship*, 205 Wis. 2d 532, 555, 556 N.W.2d 415 (Ct. App. 1996) (quoting *Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (Ct. App. 1990)). "Occasionally a clear and unambiguous provision may be found ambiguous in the context of the entire policy." *Folkman*, 264 Wis. 2d 617, ¶ 19. "There is a complementary principle to contextual ambiguity. Sometimes it is necessary to look beyond a single clause or sentence to capture the essence of an insurance agreement. The language of a policy should not be made ambiguous by isolating a small part from the context of the whole." *Id.*, ¶ 21 (citation omitted).

¶ 14. We interpret administrative rules independent of the circuit court. *State ex rel. Sprewell v. McCaughtry*, 226 Wis. 2d 389, 394, 595 N.W.2d 39 (Ct. App. 1999). Further, when interpreting administrative regulations, we use the same rules of construction and interpretation applicable to statutes. *State v. Busch*, 217 Wis. 2d 429, 441, 576 N.W.2d 904 (1998). We are to interpret statutory language in the context within

which it is used, "not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110.

## ANALYSIS

### I. Standing

¶ 15. "In order to have standing to sue, a party must have a personal stake in the outcome, and must be directly affected by the issues in controversy." *Village of Slinger v. City of Hartford*, 2002 WI App 187, ¶ 9, 256 Wis. 2d 859, 650 N.W.2d 81 (citation omitted). "Wisconsin courts generally require that a plaintiff possess standing not as a jurisdictional prerequisite but rather as a matter of sound judicial policy." *Wisconsin Bankers Ass'n v. Mutual Sav. & Loan Ass'n of Wis.*, 96 Wis. 2d 438, 444 n.1, 291 N.W.2d 869 (1980) (citing *State ex rel. First Nat'l Bank of Wis. Rapids v. M & I Peoples Bank of Coloma*, 95 Wis. 2d 303, 308 n.5, 290 N.W.2d 321 (1980)).

¶ 16. No particular words are required to effect a valid assignment. *Citizens' State Bank of Sheboygan v. City of Sheboygan*, 198 Wis. 416, 434, 224 N.W. 720 (1929); *see also Riegleman v. Krieg*, 2004 WI App 85, ¶¶ 34–35, 271 Wis. 2d 798, 679 N.W.2d 857. The important question is whether the parties to the document manifested the intent to assign the particular rights. *Holmes v. Holmes*, 182 Wis. 163, 168, 196 N.W. 248 (1923). The complaint alleges that Ledger assigned all

rights to payment from any commercial insurance companies. As between the parties to the assignment, the trial court found that "there is no dispute as to the validity of the assignment." Although National States discusses cases from other states in the context of whether documents hospitals have patients sign are "assignments," National States provides no analysis of Wisconsin law on either assignment or standing.

¶ 17. As we have seen, *see* ¶ 3 *supra*, the "Conditions of Admission" document Kathleen signed included a clause entitled "Financial Agreement *and Assignment.*" The text of the document noted that an "[*a*]*ssignment* of commercial insurance benefits to the Hospital" did not eliminate Kathleen's responsibility for payment for services she received. Kathleen specifically authorized "payment to be made directly to FROEDTERT MEMORIAL LUTHERAN HOSPITAL . . . for the benefits otherwise payable to [her] by any third party including major medical benefits." Where the parties title the operative provisions as an assignment, refer in the document to their agreement as an assignment, and give one party (the hospital) something to which the other party would otherwise be entitled (insurance payments), the intent of the parties to effect an assignment of rights is clear. *See Riegleman*, 271 Wis. 2d 798, ¶¶ 34–35; *see also Citizens' State Bank*, 198 Wis. at 434; *Holmes*, 182 Wis. at 168. The face of the Conditions of Admission document places no limitation on Froedtert's ability to enforce the assignment by any lawful method.

¶ 18. Were we to adopt National States' analysis, Froedtert's Conditions of Admission agreement would be effective if, and only if, the insurance company voluntarily paid the amount due. Perversely, were we to

adopt National States' approach, an insurance company might perceive an advantage in simply refusing to pay, expecting that their insured might be unwilling to engage in (or finance) litigation to obtain the payment to which they were entitled, or might perceive that health care providers would be reluctant to sue their insured patients in order to force the patients to interplead the recalcitrant insurance company. It is unreasonable to interpret the Conditions of Admission document to require such cumbersome, expensive and unnecessary litigation to resolve a dispute about how much the insurance company owes, where there is no serious dispute as to whom it is owed. We decline National States' invitation to open the courts to an unnecessary tsunami of litigation between health care providers, their insured patients and insurance companies in order to resolve disputes between only the insurance company and the health care provider as to the amount due. Froedtert has standing to enforce the assignment of benefits by Ledger.

## II. The "Medicare Supplement Insurance" policy

### A. Medicare background

¶ 19. The Medicare Act provides limited health insurance for the aged and disabled. 42 U.S.C. §§ 1395–1395b-9. Part A provides for services to hospitalized patients.[6] Part A covers hospital expenses at specific reimbursement rates for a specific length of time for each "spell of illness," § 1395d(a)(1), and allows an additional number of lifetime days which can be used at any time, *see* 42 C.F.R. § 409.61(a)(2). Medicare

---

[6] Medicare Part B covers other medical expenses such as doctor fees, therapy and supplies. Part B coverage is not involved in this case.

does not determine what a hospital can charge; however, Medicare will pay only the lower of the charge or the "reasonable cost" of the service, as determined by Medicare under its regulations. *See* 42 C.F.R. § 413.1(a)(1)(i)(B). Medicare also requires the patient to pay a deductible during the first sixty days of hospitalization, and a co-payment during the sixty-first to ninetieth day period. Sec. 1395e(a)(1). The government agency that administers Medicare[7] enters into contracts with hospitals to provide inpatient services; the contracts require the hospital not to charge patients additionally for the services for which Medicare pays other than applicable deductibles and co-payments. Sec. 1395cc. Specifically, as to agreements with health care providers, § 1395cc specifies:

> Agreements with providers of services; enrollment processes
>
> (a) Filing of agreements; eligibility for payment; charges with respect to items and services
>
> **(1)** Any provider of services . . . shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement—
>
> **(A)** (i) not to charge, except as provided in paragraph (2), any individual or any other person for items or services *for which such individual is entitled to have payment made under this subchapter . . . .*

(Emphasis added.)

---

[7] The United States Department of Health and Human Services' Health Care Financing Administration, now known as the Center for Medicare and Medicaid Services.

## B. Wisconsin law

¶ 20. Insurance is available from commercial companies to fill in the "gaps" in Medicare payments such as deductibles, co-payments and expenses when Part A benefits have been exhausted. These policies are often referred to as "Medigap" insurance. The Wisconsin Commissioner of Insurance issued regulations for policies marketed to Medicare-eligible individuals describing these as Medicare "supplement" and "replacement" policies, and setting the minimum requirements for such policies in Wisconsin. *See* WIS. ADMIN. CODE § INS 3.39(1)(b) (Aug. 1997).[8] The requirements material to this dispute include:

(3) Definitions.

. . . .

(d) "Medicare eligible expenses" means health care expenses which are covered by Medicare, recognized as medically necessary and reasonable by Medicare, and which may or may not be fully reimbursed by Medicare.

1 . . . .

(5) AUTHORIZED MEDICARE SUPPLEMENT POLICY AND CERTIFICATE DESIGNATION, CAPTIONS, REQUIRED COVERAGES, AND PERMISSIBLE ADDITIONAL BENEFITS . . . .

(a) The designation: MEDICARE SUPPLEMENT INSURANCE.

. . . .

(c) The following required coverages, to be referred to as "Basic Medicare Supplement coverage" for a policy issued after December 31, 1990:

---

[8] All references to the Wisconsin Administrative Code are to the August 1997 version unless otherwise noted.

. . . .

10. Coverage of Part A Medicare eligible expenses for hospitalization to the extent not covered by Medicare from the 61st day through the 90th day in any Medicare benefit period;

11. Coverage of Part A Medicare eligible expenses incurred as daily hospital charges during use of Medicare's lifetime hospital inpatient reserve days;

12. Upon exhaustion of all Medicare hospital inpatient coverage including the lifetime reserve days, coverage of *all Medicare Part A eligible expenses for hospitalization not covered by Medicare*.

(Italicization added; capitalization as in original.)

## C. This policy

¶ 21. At the time National States sold its policy to Ledger in 1998, Wisconsin law had already established core benefit packages required to be included in all Medicare supplement policies marketed in Wisconsin. *See* WIS. ADMIN. CODE § INS 3.39(1)(b). As noted above, the 1997 Wisconsin Administrative Code relating to insurance described the benefits required in Medicare supplement insurance. These included, for a policy issued after December 31, 1990, "Upon exhaustion of all Medicare hospital inpatient coverage including the lifetime reserve days, coverage of all Medicare Part A eligible expenses for hospitalization not covered by Medicare." Sec. INS 3.39(5)(c)12.

¶ 22. The 1997 definition of Medicare eligible expenses protects Wisconsin consumers by defining terms so that Medigap supplement insurance in Wisconsin must pay all expenses for those services if Medicare has determined that they are covered because

they are medically necessary and reasonable, regardless of whether Medicare would have paid the full charge for that service. The 1997 Wisconsin Administrative Code defined "Medicare eligible expenses" as:

> (d) "Medicare eligible expenses" means health care expenses which are covered by Medicare, recognized as medically necessary and reasonable by Medicare, and which may or may not be fully reimbursed by Medicare.

WIS. ADMIN. CODE § INS 3.39(3)(d).

¶ 23. These regulations, whether read singularly or together, do not specifically limit the insurance coverage to only what Medicare would have paid, and, indeed, specify the opposite.

¶ 24. At the time Ledger incurred the charges at Froedtert in 2001, the Wisconsin Insurance Regulations were unchanged.[9] *See* WIS. ADMIN. CODE § INS 3.39(5)(c)12. (July 2001, Wis. Reg. No. 547, and July 2000, Wis. Reg. No. 535).[10] These policies had to pay "all Medicare Part A eligible expenses for hospitalization

---

[9] National States argues its immunity from this 2001 claim based on changes in the federal and state law and regulations which occurred after these charges were incurred. It relies on provisions of the *2006* WIS. ADMIN. CODE § INS § 3.39(5), entitled Authorized Medicare Supplement Policy . . . Required Coverages . . . .

> 12. Upon exhaustion of all Medicare hospital inpatient coverage including the lifetime reserve days, coverage of all Medicare Part A expenses for hospitalization not covered by Medicare *to the extent the hospital is permitted to charge by federal law and regulation and subject to the Medicare reimbursement rate.*

Sec. INS 3.39(5)(c)12. (emphasis added). The 2006 regulations, which were not in effect when the charges were incurred, have no impact on this 1998 policy and 2001 claim.

[10] The language of WIS. ADMIN. CODE § INS 3.39(5)(c)12. (July 2001, Wis. Reg. No. 547), which was the regulation in

not covered by Medicare" after the hospital inpatient coverage, including lifetime reserve days, had been exhausted. Section INS 3.39(5)(c)12. As we have seen, "Medicare eligible expenses" are those expenses "covered by Medicare," but which "may or may not be fully reimbursed by Medicare." Sec. INS 3.39(3)(d). The required coverage does not depend on how much Medicare would have paid for the service in question. To legally market the policy in Wisconsin, National States had to promise to pay *all* of the hospital expenses, regardless of whether, if the benefits had not been exhausted, these expenses would have been "fully reimbursed" by Medicare. The regulation demonstrates that the reasonableness and necessity of the particular treatment was determined by Medicare when it determined that the specific treatment would normally be covered by Medicare.

¶ 25. Other sections of applicable Wisconsin regulations allowed mandated coverage payments for other services to be limited to "all usual and customary expenses." *See* Wis. Admin. Code § INS 3.39(5)(c)5. (home care expenses), 8. (chiropractic services) and 13. (diabetes treatment and expenses). No such limitation is described for hospital charges. Wisconsin regulations permitted policy exclusions that were not otherwise prohibited and that were not more restrictive than Medicare benefits.[11]

---

effect for the time of this claim, remained unchanged from the regulation in effect at the time National States began marketing its "Medigap" policy in Wisconsin which was purchased by Kathleen, i.e., "Upon exhaustion of all Medicare hospital inpatient coverage including the lifetime reserve days, coverage of all Medicare Part A eligible expenses for hospitalization not covered by Medicare."

[11] 1997 Wis. Admin. Code § INS 3.39(8)(e) specifically stated: "A Medicare replacement policy and Medicare supple-

## D. Resolving ambiguity

¶ 26. National States claims that "all further ex-
penses incurred" is modified by "that would have been
covered by Medicare Part A," which would limit its
obligation to paying only Medicare reimbursement
amounts. Froedtert reads "covered by Medicare Part A"
as modifying "hospital confinement," which would re-
quire full payment for hospital confinement if that
treatment would have been covered by Medicare Part A
before it was exhausted.

¶ 27. Because the clause can be read to establish
two different obligations, it is ambiguous. *Borchardt*,
156 Wis. 2d at 427 (Language in a "contract is ambigu-
ous when its terms are reasonably or fairly susceptible
of more than one construction."). An ambiguous insur-
ance contract will be construed against the insurer
and in favor of coverage. *State Farm Mut. Auto. Ins.
Co.*, 275 Wis. 2d 35, ¶ 15. We look to the context in
which the ambiguous clause appears. *Kalal*, 271
Wis. 2d 633, ¶ 46; *Folkman*, 264 Wis. 2d 617, ¶ 21. We
construe the terms of the contract to attempt to effect
the intent of the parties. *Fireman's Fund Ins. Co.*, 261
Wis. 2d 4, ¶ 16. We consider the language from the
perspective of what a reasonable insured would expect.
*Cieslewicz*, 84 Wis. 2d at 97–98 (insurance contracts to
be construed from standpoint of an ordinary person).

¶ 28. National States could not market this Medi-
care supplement policy in Wisconsin if it did not comply

_____

ment policy may include other exclusions and limitations
which are not otherwise prohibited and are not more restric-
tive than exclusions and limitations contained in Medicare."

with Wisconsin OCI regulations.[12] It is, therefore, reasonable to conclude that National States intended to comply with those regulations. Because the policy was required to provide certain minimum coverage mandated in the Wisconsin administrative code, we look first to those regulations.

¶ 29. Against the background of Wisconsin law, National States wrote the policy at issue here. In that policy, tracking the language of OCI regulations described above, National States defined "Medicare Eligible Expense" to include hospital expenses after Part A benefits are exhausted "which may or may not be fully reimbursed by Medicare." National States then describes "Benefits to Supplement Medicare Part A" by specifically limiting some benefits to what Medicare would have paid, but imposing no such limit on other benefits:

(1) [Y]ou must pay the Medicare Part A hospital deductible and then we will pay *all hospital copayment amounts applied by Medicare* thereafter.

(2) ... If you incur expense for hospital confinement as the result of psychiatric disorder, we will pay your hospital expense *at Medicare's reimbursement rate* ... after you have exhausted Medicare's coverage for hospital inpatient psychiatric expense.

---

[12] *See* WIS. ADMIN. CODE § INS 3.39(1)(b), which states in pertinent part:

This section is designed not only to improve the ability of the Medicare eligible consumer to make an informed choice when purchasing disability insurance, but also to assure the Medicare eligible persons of this state that the commissioner will not approve a policy or certificate as a "Medicare supplement" or as a "Medicare replacement" unless it meets the requirements of this section.

498

(3) ... When you incur expense for skilled nursing facility confinement ... eligible under Medicare, we will pay the *co-payment amounts applied by Medicare* ....

(4) ... If maximum benefits have been paid under Medicare for in-patient hospital expense, including the lifetime reserve days, we will pay *all further expense incurred* for hospital confinement that would have been covered by Medicare Part A.

National States Ins. Co. Medicare Supplement Insurance Policy, Part B, entitled "Benefits to Supplement Medicare Part A" (emphasis added).

¶ 30. In the policy exclusions section entitled, "Exceptions and Limitations," National States specifically limits its expense liability for doctor charges by excluding "*doctors' charges above Medicare-approved amounts*." (Emphasis added.) The policy contains no such exclusion or limitation for hospital charges. Similarly, and in the same section of the policy describing the supplements to Medicare Part A that National States will pay, payment for hospital psychiatric treatment is limited to "hospital expense at Medicare's reimbursement rate" while "all further expense incurred for hospital confinement" is to be paid for "hospital confinement that would have been covered by Medicare Part A."

¶ 31. As we have seen, Wisconsin OCI regulations required the insurer to pay in full for inpatient hospital charges once Medicare Part A was exhausted. The regulations also permitted exclusions and exceptions not inconsistent with the Wisconsin requirements or federal Medicare law. In its policy at issue here, National States did not specifically limit its payment obligation for these hospital charges, although it did limit its obligation to the Medicare reimbursement rate

499

for psychiatric hospitalization and for doctors' charges. In addition, National States imposed the standard of "usual and customary" charges on its payment obligations with regard to chiropractic services, home care services and diabetes treatment and equipment, but described no such limitation as to general inpatient hospitalization charges. National States demonstrated the ability to clearly describe permissible limits on payments it would make. It did not describe in its policy at issue here the limits to its payment for general inpatient hospitalization which it now seeks to assert. We conclude, therefore, that when National States obtained the necessary approval to market Medicare supplement insurance in Wisconsin, and sold this policy to Kathleen, it intended to, and Kathleen reasonably understood that it would, pay all inpatient hospital charges incurred after Medicare Part A was exhausted.

*III. Usual and customary charges*

¶ 32. As we have seen, Wisconsin regulations limited the insurance company's ability to determine whether certain charges were "usual and customary" to three types of expenses: home care expenses, chiropractic services, and diabetes treatment and equipment. *See* WIS. ADMIN. CODE § INS 3.39(5)(c)5., 8. and 13. and 3.39(6). None of those services are involved in the charges here. National States did not have the authority under Wisconsin regulations to impose a "usual and customary" test beyond what the regulations authorized.

¶ 33. National States defines charges in its policy only in terms of "usual and customary" described as:

the usual fee charged by a medical provider for a given service to a private patient (i.e. the provider[']s own usual fee). Customary means that the fee charged is

500

within the range of usual fees charged by a provider of medical services *in the same specific geographical area.*

(Emphasis added.)

¶ 34. The policy specifically limits this definition to chiropractic services and diabetic treatment and equipment. Thus, the very test National States sought to apply to Froedtert's charges[13] is authorized neither

---

[13] If National States' definition was applicable to the charges Froedtert billed, the record provides evidence to support those charges as usual and customary. Froedtert provided an affidavit by Barbara Saliek-Shaffer, a medical auditor employed by Froedtert. She is a registered nurse and has been a medical auditor for thirteen years. She stated that she reviewed the charges and was familiar with the nature of Kathleen's medical condition and the kinds of care and treatment provided. She expressed the opinion that Froedtert's charges were "reasonable in light of the nature of the care and treatment . . . and in light of the prevailing rates for such care and treatment in the Milwaukee area" at the time of the treatment.

National States failed to produce any evidence that Froedtert's charges were not its usual charges or that they were not "within the range of usual fees . . . in the same specific geographical area." National States' consultant did not claim to be familiar with hospital charges in the Milwaukee area. He expressed the opinion by affidavit that the charges were not "reasonable and usual" because: (1) he calculated that Froedtert made a profit on Medicare inpatient hospitalization; and (2) "usual" charges should be measured by what the hospital actually expects to collect based on its historic collection rate. He reduced the charges by Froedtert's historic percentage of uncollectible accounts receivable. Alternatively, he reduced the charges by what he considered the profit margin for Medicare inpatient hospital care. Then he averaged the two results from which he identified what he described as "my calculated usual charge for this claim." The trial court considered this evidence irrelevant to any issues before the court. We agree.

by its own policy nor by applicable Wisconsin OCI regulations. *See* Wis. Admin. Code § INS 3.39(5)(c)5., 8. and 13. and 3.39(6).

*IV. Statutory interest*

¶ 35. National States knew what coverage the Wisconsin OCI required when it obtained approval to market the policy it sold to Kathleen in 1998. As we have seen, language in the policy in many instances mimics language in the 1997 Wis. Admin. Code § INS 3.39. At the time the claim was made in 2001, neither the language in the policy nor the language in the relevant Wisconsin insurance regulations had changed. National States is presumed to know the law of the states in which it does business, including Wisconsin. On July 1, 2003, and again on December 23, 2004, the Wisconsin OCI told National States that under Wisconsin law and the language of its policy, it was required to pay Froedtert's full charges. Still, National States did not pay.

¶ 36. Wisconsin Stat. § 628.46(1) (1999–2000)[14] imposes interest at twelve percent for insurance claims that are not paid within thirty days of the insurance

---

[14] Wisconsin Stat. § 628.46, entitled "Timely payment of claims," states, in pertinent part:

(1) Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss .... Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment .... *All overdue payments shall bear simple interest at the rate of 12% per year.*

(Emphasis added.)

company receiving written notice of the claim. A safe harbor from the interest obligation exists if the insurer has "reasonable proof" that the claim is not payable. A fairly debatable question of law has arisen as to what is considered "reasonable proof." *See Kontowicz v. American Standard Ins. Co. of Wis.*, 2006 WI 48, ¶ 48, 290 Wis. 2d 302, 714 N.W.2d 105. National States has raised only questions of law in its effort to avoid payment of the full charge. It has relied on its legal interpretation of its policy and its legal interpretation of federal law. However, the Wisconsin OCI approved the policy National States marketed in Wisconsin and sold to Kathleen under regulations then in effect. These regulations, as we have seen, required that National States pay Froedtert's actual charges once Medicare Part A was exhausted. The Wisconsin OCI twice rejected National States' interpretation of its policy and National States' interpretation of Wisconsin law. National States' attempt to justify its position based on 2006 Wisconsin administrative regulations adopted years after the claim was made and even more years after the policy was sold does not create a fairly debatable question as to whether payment was due.

¶ 37. National States had a clear and obvious obligation under its policy and the applicable law. National States did not have "reasonable proof" that it "[wa]s not responsible for the payment" which Wis. Stat. § 628.46 requires to avoid the twelve percent interest penalty for refusing to pay a claim that is due. The trial court's award of interest pursuant to § 628.46 is affirmed.

## CONCLUSION

¶ 38. For all the reasons described above, we conclude that Froedtert and Ledger are entitled to

503

summary judgment on the National States Medicare Supplement Insurance policy for the full charges by Froedtert for inpatient treatment of Kathleen after her Medicare Part A benefits had been exhausted. We further conclude that the trial court properly awarded interest pursuant to WIS. STAT. § 628.46.

*By the Court.*—Judgment affirmed.

¶ 39. FINE, J. (*dissenting*). Insurance companies write policies to cover certain risks, and price their policies by charging premiums to account for those risks. The insurance industry (and, therefore, the ability of persons to protect themselves against *their* risks) would vanish if insurance companies were forced to pay more than they contracted to pay. The law in Wisconsin, and elsewhere, recognizes this. *See Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 264, 371 N.W.2d 392, 394 (Ct. App. 1985) ("We will not, under the guise of strict construction against the insurer, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid."). Simply put, "insurance companies are not eleemosynary endeavors." *Bruchert v. Tokio Marine & Nichido Fire Ins. Co.*, 2007 WI App 156, ¶ 12, 303 Wis. 2d 671, 678, 736 N.W.2d 234, 238.

¶ 40. In this case, National States Insurance Company issued a Medigap insurance policy covering Kathleen Ledger. The policy promised: "If maximum benefits have been paid under Medicare for in-patient hospital expense, including the lifetime reserve days, we will pay all further expense incurred for hospital confinement that would have been covered by Medicare Part A." Contrary to the Majority's assertion, Majority, ¶ 27, this clause is *not* ambiguous.

¶ 41. First, it is triggered when Medicare in-patient hospital-coverage is exhausted.

504

¶ 42. Second, when that happens, it promises that National States will pay:

- "further expense incurred for hospital confinement" *provided*

- that "further expense" "would have been covered by Medicare Part A."

There is no dispute here but that Medicare Part A *would not have covered* the charges for which Froedtert Memorial Lutheran Hospital seeks payment from National States. This ends the discussion.[1]

---

[1] The Wisconsin Administrative Code provisions, quoted by the Majority at ¶¶ 20, 22, and 24 n.10, are wholly consistent with the plain reading of National States's obligations here. First, Wis. Admin. Code § INS 3.39(3)(d) (1997) defined "Medicare eligible expenses" to mean "health care expenses *which are covered by Medicare,* recognized as medically necessary and reasonable by Medicare, and which may or may not be fully reimbursed by Medicare." (Emphasis added.) Thus, in order to be "Medicare eligible expenses," the expenses must be "covered by Medicare" because those expenses are determined by Medicare to be "necessary and reasonable." Medicare's agreement with Froedtert promises to pay Froedtert, and Froedtert promises to accept, Medicare's determination of what is "necessary and reasonable" irrespective of what Froedtert might bill others not protected by the Medicare umbrella. The appended clause, "which may or may not be fully reimbursed by Medicare" merely means that once Medicare coverage is exhausted, as is the case here, Medicare will no longer reimburse the healthcare provider for the whole of the Medicare-approved "necessary and reasonable" expense. To say that the clause, "which may or may not be fully reimbursed by Medicare" means what the Majority construes it to mean, ignores the "which are covered by Medicare" requirement, which is, as we have seen, congruent with the "that would have been covered by Medicare Part A" proviso in the National States policy.

¶ 43. Making National States pay a risk that it did not insure not only robs it to pay Froedtert, it will have a cascade effect of forcing insurance companies issuing Medicare supplemental-coverage policies to increase their premiums. This is true for two reasons. First, the companies will be forced to pay more than Medicare would have paid. Second, those premiums will *also* have to account actuarially for the *uncertainty* of not being able to rely on a Medicare-negotiated cap; rather than the cap, the insurance companies will be faced with potentially unlimited liability flowing from health-care providers being able to bill them for, essentially, whatever a market unconstrained by Medicare's bargaining

WISCONSIN ADMIN. CODE § INS 3.39(5)(c)12 (2001) is also consistent with the National States policy. As the Majority recognizes in ¶ 24 n.10, that regulation reads: "Upon exhaustion of all Medicare hospital inpatient coverage including the lifetime reserve days, [the policy must provide] coverage of all Medicare Part A eligible expenses for hospitalization not covered by Medicare." The expenses must be "*eligible*" under "Medicare Part A." There is no dispute here but that what Froedtert seeks to recover from National States are not "Medicare Part A eligible expenses."

Although Mrs. Ledger agreed upon her admittance to Froedtert to be "financially responsible for all charges incurred" by her during her stay at the hospital, her undertaking does not negate her contract with National States, nor could it. A simple example will make this clear. Assume a bonding company guarantees a contractor's obligation to build a building, with a liability limit of $100,000. Assume further that the contractor's contract with the owner obligates the contractor to complete the construction or be liable for all the costs of delay and remediation. Assume still further that those costs are $500,000. Could anyone seriously argue that the bonding company would be liable for the $500,000 rather that its $100,000–undertaking? Of course not. That is the situation we have here.

power will bear. All of this will make it more difficult for many elderly in our state to buy Medigap insurance. I respectfully dissent.